STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael J. KRYZANIAK, Defendant-Appellant.[Case No. 00–1149–CR]

STATE of Wisconsin, Plaintiff-Respondent,

v.

Sherry L. KRYZANIAK, Defendant-Appellant.[Case No. 00–1150–CR]

Court of Appeals

*Nos. 00–1149–CR, 00–1150–CR. Submitted on briefs November 9, 2000.—Decided January 17, 2001.*

2001 WI App 44

(Also reported in 624 N.W.2d 389.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Raymond G. Meyer* of *Koenen & Meyer* of Port Washington and *F. M. Van Hecke* of *Van Hecke Law Offices Chartered* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *David H. Perlman,* assistant attorney general, and *James E. Doyle,* attorney general.

Before Nettesheim, Anderson and Snyder, JJ.

¶ 1. SNYDER, J. Michael and Sherry Kryzaniak (the Kryzaniaks) appeal from each of their judgments of conviction for possession of tetrahydro-cannabinols (THC), second offense. Michael also appeals from his conviction for carrying a concealed weapon. Specifically, the Kryzaniaks appeal from the trial court order denying their suppression motion. The Kryzaniaks argue that their Fourth Amendment rights were violated when an Ozaukee county deputy sheriff entered their home with neither their consent nor a warrant because no exigent circumstances existed. We agree and reverse the order denying their suppression motion and their judgments of conviction.[1]

## FACTS

¶ 2. On December 10, 1998, Joshua Anderson, the subject of a civil capias, was seen in the visitation area of the Ozaukee county jail. A deputy sheriff asked Anderson to wait within a partially secure area of the jail. However, when another person was released from that area, Anderson followed him out and left the jail. The Ozaukee County Sheriff's Department commenced a search for Anderson, first looking for him in and around the jail, and then later in various places around Saukville, Wisconsin.

¶ 3. After hearing of Anderson's flight over a transmitter radio while at home for lunch, Deputy Wil-

---

[1] Michael and Sherry Kryzaniak were charged separately (Nos. 98–CF–282 and 98–CF–281, respectively). Upon appeal, the Kryzaniaks moved to consolidate the two related appeals (Nos. 00–1149–CR and 00–1150–CR) because of the uniformity of issues. On May 16, 2000, we granted this motion to consolidate the appeals and therefore address the two appeals as one.

liam Steck joined the search for Anderson. Steck did not observe the commission of any crime by Anderson nor was he involved in the earlier attempted capias detention. Steck did not know Anderson either by sight or by name and overheard only a limited description of Anderson, specifically,. a younger white male with a black hooded sweatshirt and a dark-colored baseball cap. A Saukville police officer knew of some people Anderson regularly associated with and provided Ozaukee county deputies with two addresses Anderson had been known to frequent, including the address of Brad Walberg, a friend of Anderson's.

¶ 4. At approximately 9:00 p.m. that same day, three officers went to Walberg's home; the home, a multi-level residence occupied by two separate families, was also the residence of the Kryzaniaks. Walberg and his mother exclusively occupied the upper level and the Kryzaniaks exclusively occupied the lower level, with a common entrance on the middle level. The officers decided that two officers would approach the front door of the residence, and that Steck (a plain-clothes officer) would wait and watch at the back of the home. While Steck was in position, a young man generally fitting the description of Anderson exited the rear door of the home. Steck did not observe Anderson carrying anything nor did he believe Anderson to be either armed or dangerous.

¶ 5. Steck identified himself and said "don't move" to the young man. The young man ignored the order and reentered the door, locking it behind him.˙ Steck called to the young man, indicating that if the door was not opened, he would force it open; Steck then kicked open the door and entered the residence. At the time of the entry, Steck was not certain that this young man was, in fact, Anderson and had no idea who

resided in or owned this home. Steck had no warrant to arrest Anderson, no warrant to enter the home and no consent from any person to be on the premises.

¶ 6. Lighting was poor in the room of Steck's initial entry, the Kryzaniak living room. Light from the stairway to the next level came into the Kryzaniak living room, and Steck observed that he was in a living room and that ahead of him were two door openings. One door opening was to the basement stairway and the other was to a short stairway up to the front common entrance. Steck believed that the young man must have used one of these stairways, but was unsure which one. Steck called into the basement for the young man's surrender, with no response. When Steck crossed the living room and arrived at the basement door, he observed doors to the Kryzaniak bedroom and bathroom behind him. Even though he thought the young man had used the basement stairs, Steck entered the Kryzaniak bedroom, turned on the bedroom light, and looked for the young man, searching under the bed and in a closet.

¶ 7. Instead of entering the basement, Steck waited in the Kryzaniak apartment for the arrival of a canine unit. He could hear discussion upstairs, along with the voice of a fellow officer, so he knew that an officer was inside the premises. Once the canine unit arrived, Anderson was captured within a few minutes, in a bedroom two levels above the Kryzaniak living room. Anderson was taken into custody at 9:14 p.m. and removed from the premises almost immediately after his discovery. After Anderson was captured upstairs, Steck then searched the basement of the building.

¶ 8. Steck claimed that during the course of his search for Anderson, he observed drug paraphernalia

364

and what he thought could be marijuana in the Kryzaniak apartment. While he did not at that time seize the property, these observations formed the basis for the search warrant that was ultimately issued for the premises.

¶ 9. Based upon information received from Walberg, the Kryzaniaks were found at a local night spot and returned home about 10:30 p.m. By that time there were five or six police officers present on the premises as well as the canine unit, and at least one officer was present in the house at all times. Michael Kryzaniak observed flashlights being shined about his bedroom as he came to the rear of his home. The Kryzaniaks entered the premises and refused the officers permission to search the premises.

¶ 10. The Kryzaniaks were then arrested and removed from the premises by 10:30 p.m. Steck obtained a search warrant for the premises based upon his observations of the alleged drugs and drug paraphernalia, and the search warrant was issued shortly after midnight. After obtaining the search warrant, Steck returned to the Kryzaniak home and seized the paraphernalia, drugs and other evidence. In addition, because Michael had a 1971 felony conviction, a rusty rifle and two trap shooting guns were also seized. All seizures were made after 12:22 a.m. on December 11, 1998.

¶ 11. The Kryzaniaks were both charged with possession of THC, second offense, and possession of drug paraphernalia, as a party to a crime; Michael was additionally charged with being a felon in possession of a firearm. After a motion to suppress the evidence on the grounds of an unlawful search was denied, the Kryzaniaks each entered a plea of no contest to the possession charges, and Michael pled no contest to an

amended concealed weapon charge. The paraphernalia charges were dropped. This appeal followed.

## DISCUSSION ·

¶ 12. The question before us, whether Steck's warrantless entry into the Kryzaniak apartment was justified by exigent circumstances, is a mixed question of constitutional fact that we review under two different standards. *State v. Richter*, 2000 WI 58, ¶ 26, 235 Wis. 2d 524, 612 N.W.2d 29. The trial court's findings of evidentiary or historical fact will not be overturned unless they are clearly erroneous. *Id.* However, we independently determine whether the historical or evidentiary facts establish exigent circumstances sufficient to satisfy the warrantless entry. *Id.*

¶ 13. The Kryzaniaks argue that their Fourth Amendment rights were violated when Steck forcibly entered their home without their consent or a warrant because no exigent circumstances existed justifying the entry. We agree.

¶ 14. The Fourth Amendment to the United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Wisconsin Constitution is essentially the same. WIS. CONST. art. I, § 11. Warrantless searches "are per se unreasonable under the fourth

366

amendment, subject to a few carefully delineated exceptions" that are "jealously and carefully drawn." *State v. Boggess*, 115 Wis. 2d 443, 449, 340 N.W.2d 516 (1983) (citations omitted).

■ .

¶ 15. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' " *Welsh v. Wisconsin*, 466 U.S. 740, 748 (1984) (citation omitted). A fundamental safeguard against unnecessary invasions into private homes is the Fourth Amendment's warrant requirement, imposed on all governmental agents who seek to enter the home for purposes of search or arrest. *Id.* It is not surprising, then, that the United States Supreme Court has recognized that all warrantless searches and seizures inside a home are presumptively unreasonable. *Id.* at 748–49.

■

¶ 16. The police bear a heavy burden when trying to establish an urgent need justifying warrantless searches. *Id.* at 749–50. Before the government may invade the sanctity of the home, the government must demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries. *Id.* at 750. Four factors have been identified that, when measured against the time needed to obtain a warrant, constitute the exigent circumstances required for a warrantless entry: (1) an arrest made in "hot pursuit"; (2) a threat to the safety of a suspect or others; (3) a risk that evidence would be destroyed; and (4) a likelihood that the suspect would flee. *State v. Smith*, 131 Wis. 2d 220, 229, 388 N.W.2d 601 (1986). Here, the State argues that exigent circumstances, specifically the "hot pursuit" of Anderson,

justified Steck's entry into the Kryzaniak home. We disagree.

¶ 17. The United States Supreme Court has defined "hot pursuit" as that circumstance where there is an "immediate or continuous pursuit of [a suspect] from the scene of a crime." *Id.* at 231–32 (citation omitted). It is the continuity of the pursuit that prevails. *Id.* at 232.

¶ 18. Turning to the facts at hand, there was no immediate or continuous pursuit of a suspect from the scene of a crime; thus, there was no hot pursuit and no exigent circumstances. There is no evidence in the record that any police officer pursued Anderson from the jail when he left. Steck first learned about Anderson when he overheard conversations between the police dispatcher and various squad cars on his portable radio while he was at home for lunch. He did not see any crime committed nor was he involved in the earlier capias detention. He did not know the exact circumstances of Anderson's departure; in fact, he did not even know Anderson's name and could not identify Anderson. Initially officers, including Steck, were looking for Anderson in the northern part of Port Washington. A Saukville police officer overheard some of the radio talk, thought he had seen Anderson earlier in the day, and knew some places where Anderson was known to hang out; police were checking out all of those possible addresses. There was no pursuit here, only a day-long investigation of Anderson's whereabouts. The police were at the Kryzaniak residence as the result of an investigation, not a police chase.

¶ 19. Once at the residence, Steck did not know who resided at the home. Steck admitted that because of the darkness and the poor light, he could not see the young man at the back door very well and did not know if the young man was, in fact, Anderson. The young man's retreat into the house, when it was unknown whether the young man was, in fact, Anderson, did not create exigent circumstances. The police themselves cannot create the exigency by merely conducting an investigation. *Id.* at 234. If they could, then any time an investigation is conducted the police would "obviate the need for a warrant. Such a broad construction of this exigency does not recognize the urgent-need rationale underlying this exception to the warrant requirement." *Id.*

¶ 20. The illegality of the search is further evidenced by police behavior after Anderson's apprehension. Anderson was taken into custody between 9:00 and 9:30 p.m., and the search warrant was not obtained until after midnight; however, when the Kryzaniaks arrived at their home between 10:00 and 10:30 p.m., police flashlights were visible in and officers were searching their bedroom. In addition, Steck admitted that he searched the Kryzaniak basement after Anderson had already been taken into custody but before the search warrant had been issued. The officers had no right to conduct a search of the bedroom or the basement after Anderson's detention because no exigent circumstances existed and the warrant had not been issued.

¶ 21. Our reluctance to find exigent circumstances is especially appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. *Welsh*, 466 U.S. at 750. When the

government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut. *Id.* The United States Supreme Court has recognized that warrantless home invasions can only occur with the most serious of crimes. *Id.* at 750 n.12. Citing Justice Jackson's concurrence in *McDonald v. United States*, 335 U.S. 451, 459–60 (1948), the *Welsh* Court observed why a finding of exigent circumstances justifying a warrantless home entry should be severely restricted when only a minor offense has been committed:

> Whether there is reasonable necessity for a search without waiting to obtain a warrant certainly depends somewhat upon the gravity of the offense thought to be in progress as well as the hazards of the method of attempting to reach it. . . . It is to me a shocking proposition that private homes, even quarters in a tenement, may be indiscriminately invaded at the discretion of any suspicious police officer engaged in following up offenses that involve no violence or threats of it. While I should be human enough to apply the letter of the law with some indulgence to officers acting to deal with threats or crimes of violence which endanger life or security, it is notable that few of the searches found by this Court to be unlawful dealt with that category of crime. . . . I do not think . . . suppression is more important to society than the security of the people against unreasonable searches and seizures. When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant.

*Welsh*, 466 U.S. at 750–51.

¶ 22. Consequently, the nature of the underlying offense is an important factor to be considered in the exigent circumstances calculus. *Id.* at 751. Most courts addressing this issue have disallowed warrantless home arrests for nonfelonious crimes. *Id.* at 752. The United States Supreme Court itself commented that "it is difficult to conceive of a warrantless home arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Id.* at 753. The application of the exigent circumstances exception in the context of a home entry should "rarely be sanctioned when there is probable cause to believe that only a minor offense . . . has been committed." *Id.*

¶ 23. At the time of Steck's entry into the Kryzaniak home, there was no arrest warrant for Anderson nor were there any outstanding criminal charges, only a civil capias. A civil capias does not rise to a level sufficient to implicate exigent circumstances.

¶ 24. Even if there had been a warrant for Anderson's arrest, Steck needed a search warrant to enter the Kryzaniak apartment to look for Anderson and execute the arrest warrant; an arrest warrant is insufficient legal authority to enter the home of a third party to conduct a search. *State v. Kiper*, 193 Wis. 2d 69, 89, 532 N.W.2d 698 (1995) (citing *Steagald v. United States*, 451 U.S. 204, 213 (1981)). Steck could not use the arrest warrant as legal authority to enter the Kryzaniak home based on the simple belief that Anderson might be there because that belief was never subjected to the neutral and detached scrutiny of a judicial officer. *Id.* If exigent circumstances had devel-

371

oped during an attempt to identify and arrest Anderson, Steck could have lawfully entered the Kryzaniak apartment without a search warrant. *Id.* However, the facts here do not indicate that any exigency developed at any time during Steck's encounter with Anderson at the Kryzaniak home. Anderson's retreat to the house, when it was unknown to Steck if that individual was, in fact, Anderson, coupled with the lack of evidence that the young man was armed or dangerous, does not constitute exigent circumstances.

¶ 25.　We recognize that a fundamental concern for police "is that persons, as opposed to objects, are inherently mobile, and thus officers seeking to effect an arrest may be forced to return to the magistrate several times as the subject of the arrest warrant moves from place to place." *Id.* at 91 (citation omitted). However, with Steck at the back door and two other officers at the front door, the chances of Anderson's flight were minimal. Anderson's mobility did not create an exigency or an impediment to law enforcement as much as it created an inconvenience for police who, once aware of his presence at the Kryzaniak apartment, were required to secure a search warrant to gain entry. *Id.* at 91–92.

## CONCLUSION

¶ 26.　The Kryzaniaks' Fourth Amendment rights were violated when Steck entered and searched their home without consent or a warrant because no exigent circumstances existed. The order denying the Kryzaniaks' motion to suppress all of the evidence obtained during this search and the judgments of conviction are therefore reversed.

*By the Court.*—Judgments and order reversed and cause remanded.