STATE of Wisconsin, Plaintiff-Respondent,

v.

Jed A. GIEBEL, Defendant-Appellant.

Court of Appeals

*No. 2006AP189–CR. Submitted on briefs August 23, 2006.*
*—Decided October 25, 2006.*

2006 WI App 239

(Also reported in 724 N.W.2d 402.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert E. Bellin, Jr.* of *Hammett, Bellin & Oswald, LLC* of Neenah.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Juan Colas*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Snyder, P.J., Brown and Nettesheim, JJ.

¶ 1. SNYDER, P.J. Jed A. Giebel appeals from a judgment of conviction for four counts of possession of child pornography in violation of Wis. Stat. § 948.12(1m) (2003–04).[1] Giebel argues that the circuit court erred when it held that he voluntarily consented to the search and seizure of his computer and computer disks. He contends that his consent to search his bedroom and seize his computer was involuntary and coerced by police misrepresentation and therefore the evidence obtained should have been suppressed. We agree and reverse the judgment of conviction.

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise noted.

## BACKGROUND

¶ 2. Winnebago County Sheriff's Detective Ronald Lewis received a request from the Neenah Police Department to follow up on a complaint. The allegation involved an individual who displayed a sexually provocative picture while participating in an online chat room. The complainant stated that the person who displayed the photo online was using the identity of a fifteen-year-old girl and had indicated it was a self-photo. The Neenah police had executed a subpoena for the Yahoo!® Internet account associated with the pornographic image, which led back to Giebel. The Neenah police forwarded this information to the sheriff's detective division. Lewis described the subpoena as a tool for tracing the source, or address, from which the image had been posted.

¶ 3. On January 20, 2004, Lewis and a colleague, Detective Mack, went to Giebel's house to investigate further. They were admitted to the home by Giebel's mother. After Giebel came downstairs to see them, the officers talked to Giebel alone. The record reveals some fundamental disagreement between the parties as to what occurred and what was said while the officers were talking alone to Giebel. In his statement of the case, Giebel relies heavily on the motion hearing transcript and we do likewise in order to accurately capture the competing testimony before the circuit court.

¶ 4. Lewis testified that when he and Mack first talked to Giebel, they produced their law enforcement credentials and stated they were there to investigate some issues related to Giebel's computer. Lewis stated that Giebel became concerned and asked some questions. Lewis responded that the investigation concerned his use of the Internet and the computer. Lewis testified

450

that he asked to take a look at the computer, "and [Giebel] said we could, and we went upstairs to his bedroom." Lewis explained that Giebel himself led them to the computer, though his later testimony indicates that Giebel told them the computer was upstairs and Mack actually led the way.

¶ 5. Once in Giebel's bedroom, Lewis observed a picture of a vagina on the computer screen. He told Giebel, "[T]his is what I came here to talk to you about." Lewis raised the issue of the image that had been sent over the Internet and testified that Giebel "admitted that he had images of child pornography on his computer" and "freely and voluntarily turned over . . . one or two or three of these large plastic tubs filled with three by five floppy disks and he said here they are." Lewis stated that Giebel also identified computer files that contained pornography. The officers told Giebel they were going to take the computer and the disks into custody.

¶ 6. On cross-examination, Lewis testified that he did not have the Yahoo® account subpoena with him at Giebel's house. Lewis clarified later that his usual practice is to carry a black file folder, which he "very well could have" had with him at the Giebel residence. He testified that he did not remember if he had the file and, further, that if he did have the file, he could not remember what was in it. Lewis explained that the original intent of his visit to the Giebel residence was to do a "knock and talk," which is a practice used to gather information before probable cause for a warrant exists. He stated he "could have" advised Giebel that a judge had issued a subpoena and "could have" shown documents from the black folder.

¶ 7. Giebel testified that after his mother left the room, Lewis "opened his folder and said I have a

subpoena from Judge Carver." Giebel stated that he was shown only the top half of the subpoena in the folder. More specifically, Giebel explained that Lewis "had his folder open . . . and he turned it so I could see that it was stamped subpoena on the top, and when I reached to look at it he closed his folder." Giebel testified that Lewis then immediately asked if he had a computer and when Giebel said "yes," Lewis said "let's see it." Giebel responded, "I assume I have no choice." When asked to explain why he felt he had no choice to refuse consent, Giebel testified that he believed the subpoena was for his computer.

¶ 8. Giebel relates that soon after they arrived in his room Lewis told him that he wanted to look at the computer and was "going to take the computer." Giebel testified that he said "I assume I have no choice again," and Lewis responded, "No." On cross-examination, Giebel stated that Lewis showed him the subpoena "probably three different times including downstairs, upstairs, and at the office when he was taking a statement." He repeated that when Lewis showed him the subpoena he felt the message was that he was required to cooperate with Lewis and required to turn over his computer.

¶ 9. On re-direct, Lewis emphasized that he never indicated that he had a search warrant that would allow him to take custody of the computer or floppy disks. He conceded it was "[q]uite possible" that he had made reference to the subpoena when talking to Giebel, but also "very possible" that he had explained that the subpoena was only a tool to find an address. Nonetheless, Lewis could not recall whether he showed a subpoena to Giebel. Further, he could not recall whether Giebel made any statement to indicate he felt he had no choice but to agree.

¶ 10. The parties briefed the issue for the circuit court and the court issued an oral decision on July 15, 2005. The circuit court held that the evidence would not be suppressed because, under the totality of the circumstances, the State had demonstrated that Giebel's consent was voluntary. Giebel subsequently pled no contest to four counts of possession of child pornography. He now appeals.

## DISCUSSION

¶ 11. Giebel argues that his consent to search his room and seize his computer was coerced by police deception and therefore was not voluntary. Voluntariness of consent to search raises a mixed question of fact and law. *State v. Vorburger*, 2002 WI 105, ¶ 88, 255 Wis. 2d 537, 648 N.W. 2d 829. We review a circuit court's determination as to the voluntariness of consent to search in two steps, examining the circuit court's findings of fact under the clearly erroneous standard, but applying constitutional standards to those facts de novo. *Id.*

¶ 12. The test for voluntariness asks whether consent was given in the "absence of actual coercive, improper police practices designed to overcome the resistance of a defendant." *State v. Clappes*, 136 Wis. 2d 222, 245, 401 N.W.2d 759 (1987). In making this determination, no single factor is dispositive. *State v. Hughes*, 2000 WI 24, ¶ 41, 233 Wis. 2d 280, 607 N.W.2d 621. Rather, we examine the totality of the circumstances and place special emphasis on the circumstances surrounding the consent and the characteristics of the defendant. *Id.* The State has the initial burden to

show that the defendant's consent was voluntary. *Id.*, ¶ 42. To do so, the State must demonstrate by clear and convincing evidence that the defendant gave consent, without any duress or coercion, express or implied. *State v. Phillips*, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998). In Wisconsin, the State need not prove that the defendant knew of the right to refuse consent. See *State v. Xiong*, 178 Wis. 2d 525, 532, 504 N.W.2d 428 (Ct. App. 1993).

¶ 13. We turn to the circuit court's findings of fact. In its oral decision, the court rested its decision on the following: (1) the subpoena was shown to Giebel, (2) Giebel was of sufficient intelligence to be able to understand things explained to him, (3) Giebel had previous contact with law enforcement, and (4) Giebel believed the officers were there because he had been downloading music. The court then held that "although [Giebel] may have had a belief that the subpoena was tantamount to a warrant, the officers did nothing to lead him to believe that and his mistaken belief is not going to be held against the officers."

¶ 14. Giebel argues that the circuit court applied the right test and properly examined the totality of the circumstances, but it reached the wrong conclusion. He contends that the historical facts found by the court, when measured against constitutional standards of voluntariness, demonstrate that his consent was obtained through deception and coercion. He emphasizes that, to be voluntary, consent must be the product of essentially free and unconstrained choice. *See U.S. v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999).

¶ 15. The State argues that this case is merely a question of credibility. It asserts that, because credibility determinations are the province of the circuit court, we should not reverse the circuit court. *See State v.*

*McCallum*, 208 Wis. 2d 463, 488, 561 N.W.2d 707 (1997) ("[T]he circuit court is in a much better position than an appellate court to resolve whether the witness is inherently incredible."). The State's primary proposition seems to be that the circuit court adopted Lewis' version of the facts instead of Giebel's and, therefore, the court's legal conclusions should be left undisturbed.

■

¶ 16. While we agree with the State that credibility determinations should be left to the circuit court, we disagree that credibility is dispositive. As stated earlier, we determine de novo whether the constitutional standard of voluntariness is met. *Vorburger*, 255 Wis. 2d 537, ¶ 88. In doing so, we will not presume acquiescence in the loss of a fundamental right. *Ohio Bell Tel. Co. v. Pub. Util.'s Comm'n of Ohio,* 301 U.S. 292, 307 (1937). Moreover, we note that the circuit court found Giebel's version of the facts to be credible. Specifically, the court accepted Giebel's allegation that Lewis showed Giebel the subpoena.

¶ 17. Three considerations weigh heavily in our decision. First, Giebel, whom the circuit court found to be of average intelligence, was unlikely to know that a subpoena is significantly different from a search warrant. Second, the officers lent legal significance to the subpoena by telling Giebel that it was "a subpoena from Judge Carver." Finally, Giebel's response to the subpoena indicated that he believed resistance was futile.

■

¶ 18. Consent must be more than mere acquiescence to a claim of lawful authority. *See Bumper v. North Carolina,* 391 U.S. 543, 548–49 (1968). In *State v. Kiekhefer,* 212 Wis. 2d 460, 471–74, 569 N.W. 2d 316 (Ct. App. 1997), we held that where the police represented that they could obtain a search warrant when in

fact they could not, that misleading statement of authority led to consent that was not the product of free and unconstrained choice. Orderly submission to law enforcement officers who, in effect, incorrectly represent that they have the authority to search and seize property, is not knowing, intelligent and voluntary consent under the Fourth Amendment. *See United States v. Elliott*, 210 F.Supp. 357, 360 (D. Mass 1962).

¶ 19. Subtle suggestions, strategically made, may amount to deception or trickery where the intent is a misrepresentation of authority. Here, we cannot fathom any other reason for Lewis' display of the subpoena. The subpoena simply showed Giebel's address as the one associated with an email account. Had Giebel asked Lewis how the investigation led to his home, perhaps the subpoena would have been relevant. Here, the subpoena simply had no application to the conversation as it occurred.

¶ 20. Like the circuit court, we ascertain no outright deceit or blatant misrepresentation by Lewis or Mack; however, we believe that a reasonable police officer would understand, appreciate, and anticipate that a person of average intelligence would not grasp the distinction between a subpoena and a warrant. We are convinced that when the officers offered Giebel a fleeting glimpse of the subpoena signed by a judge, they suggested authority they did not possess. It was this suggestion of authority that led Giebel to believe he could not refuse consent for the officers to search his room and seize his computer.

## CONCLUSION

¶ 21. To be voluntary, consent must be the product of essentially free and unconstrained choice. *Zapata*, 180 F.3d at 1241. Under the totality of the circumstances, particularly those surrounding the consent and the characteristics of the defendant, we conclude Giebel's consent was not voluntary. Rather, it was mere acquiescence to Lewis' suggestion of authority. Because Giebel's consent was not voluntary, Lewis and Mack violated Giebel's Fourth Amendment right to be free from unreasonable search and seizure. Accordingly, Giebel's motion to suppress should have been granted.

*By the Court.*—Judgment reversed.