STATE of Wisconsin, Plaintiff-Respondent,

v.

Miguel A. AYALA, Defendant-Appellant.†

Court of Appeals

*No. 2009AP2690–CR. Submitted on briefs November 2, 2010.
—Decided December 21, 2010.*

2011 WI App 6

(Also reported in 793 N.W.2d 511.)

† Petition for Review filed.

171

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Martin E. Kohler* and *Craig S. Powell* of *Kohler & Hart, LLP* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Mark A. Neuser*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. KESSLER, J. Miguel A. Ayala appeals from a judgment of conviction and sentence after a jury found him guilty of one count of first-degree intentional homicide as party to a crime by use of a dangerous weapon, contrary to WIS. STAT. §§ 940.01(1)(a), 939.05 and 939.63(1)(b) (2007–08),[1] and three counts of armed robbery with use of force, as party to a crime, contrary to WIS. STAT. §§ 943.32(2) and 939.05. Ayala argues that the trial court erred in failing to suppress a gun and Ayala's statement to police officers because of the officers' warrantless entry into the bedroom of an apartment in which Ayala was staying as an overnight guest, resulting in both his unlawful arrest and an unlawful seizure of evidence. We conclude that there was probable cause to arrest Ayala and that under the circumstances known to the officers at the time, exigent circumstances justified the warrantless entry into the bedroom. Consequently, the trial court correctly refused to suppress the gun found in a protective sweep of

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

the bedroom. In addition, after a *Miranda-Goodchild*[2] hearing, the trial court found that the statements subsequently made by Ayala to police were freely and voluntarily made. We affirm.

## BACKGROUND

¶ 2. According to the criminal complaint, on January 26, 2008, Ayala, Carlos Gonzalez and Irene Rodriguez attempted to rob Lodewikus "Vic" Milford, a Miller Brewing Company executive, and three of his Miller co-workers as the group was leaving a restaurant where they had dinner. Shortly after 1:00 a.m., the group was walking toward their cars in a parking lot near the restaurant. As Milford approached his car, Ayala advanced towards Milford, pointed a gun at him, and demanded money. Milford gave Ayala his wallet. Ayala then demanded money from two of Milford's co-workers, who complied. During these events, Milford's car alarm went off, upsetting Ayala. Milford got in the driver's seat and shut the door. Ayala claimed Milford made a "slick" comment, which offended Ayala. Ayala then fired two shots through the driver's side window, into Milford's neck. Milford died at the scene.

¶ 3. By January 30, 2008, officers investigating the Milford homicide had gathered information from people with knowledge of the robbery, leading them to identify Ayala as their prime suspect.[3] Officers also had

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966) and *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

[3] On January 29, 2008, police received a tip from an anonymous informant that Carlos Gonzalez and a person named "Wedo" were involved in the Milford homicide. Police later determined that Ayala was known as "Wedo." Police arrested Gonzalez, who blamed Ayala for the shooting, and later

information that Ayala was a member of the Latin Kings gang. Police also knew from their experience that a tavern called Jo Jo's and the apartment above it had Latin Kings associations. At approximately noon on January 30, based on information that Ayala was there, police went to Jo Jo's and the apartment to look for Ayala.

¶ 4. Although various officers differ in their recollection of some details of the ensuing events, the following facts were established in the trial court: Rochelle Cervantes, her husband, Jose, and her sons Steven Cervantes and Andy Hernandez lived in the apartment above Jo Jo's. Rochelle and Jose ran the tavern.[4] Rochelle came to the door in response to the police appearance. Police showed Rochelle a picture of Ayala and asked if he was in the building. She replied affirmatively and pointed to a bedroom at the top of the stairwell. The officer who had shown her the picture said he would like to "go get [Ayala]."

¶ 5. Testimony at the suppression hearing by police officers on the scene and Rochelle differ significantly regarding what happened after Rochelle pointed to the room Ayala was staying in. The officers testified that Rochelle said "go, go, go" in response to the officer saying he would like to "go get [Ayala]." Rochelle denies agreeing to let police in the building and denies saying some variation of "go" to police. When officers went to

---

implicated Rodriguez as the getaway driver. Rodriguez was interviewed and initially implicated only Ayala but later admitted driving Ayala and Gonzalez from the scene and sharing the robbery proceeds. Therefore, probable cause existed to arrest Ayala.

[4] Because a number of family members with the same last name play material roles in this case, we refer to them by their first names for clarity.

the bedroom Rochelle indicated that Ayala occupied, the door was partially closed. The officers entered without knocking or announcing their presence, had guns drawn, and found Ayala in bed. Officers asked Ayala for his name, to which he responded truthfully, and Ayala was then arrested. The officers then conducted a protective sweep. Upon lifting the mattress where Ayala had been laying, they discovered a handgun. The handgun was left in place, and Ayala was escorted outside. Later, after the gun was removed and processed, it was determined that the gun was loaded and that it matched the type of gun that killed Milford. Later in the afternoon of his arrest, in response to police questioning, Ayala made inculpatory statements about his involvement in the murder and robbery of Milford.

¶ 6. Officers Christopher Blaszak and Timothy Bandt were two of multiple police officers on the scene the day of Ayala's arrest. Both officers testified at the *Miranda-Goodchild* hearing that Rochelle gave oral consent to search the apartment for evidence in a homicide investigation. In addition, Rochelle signed and dated Officer Blaszak's memo book below the statement: "We give police consent to search our house at 600 W. Maple for weapons and/or evidence related to a homicide investigation." This statement was also signed by Jose, Steven, and Hernandez.

¶ 7. The trial court found that Jo Jo's was a known Latin Kings hang out and that Ayala was a known Latin King. The trial court believed the officers' testimony that they had consent from Rochelle to enter the apartment and go to the upstairs bedroom to get Ayala, that she said "go, go," and that the original consent was corroborated by her signature. The trial court found that Rochelle's testimony denying that she

178

gave the officers consent to enter the apartment and denying a Latin Kings presence at her bar "wasn't . . . very credible based upon the court's observation."

¶ 8. The court found that the officers did not knock on the bedroom door because they knew the murder weapon had not been found, and believing that Ayala, the prime suspect, owned the murder weapon, they feared they would be shot if they announced their presence. The court found that there was probable cause to arrest Ayala, that the officers entered the building with consent, and that there were exigent circumstances which justified entry into the bedroom based on the circumstances known to the officers at the time.

¶ 9. Ayala argues on appeal that his warrantless arrest violated his Fourth Amendment protections because: (1) there was no valid consent to enter the apartment; (2) as an invited guest he had a reasonable expectation of privacy in the bedroom and he did not consent to entry into the bedroom; (3) there were no exigent circumstances permitting a warrantless entry; and (4) everything that flowed from the unlawful entry into the bedroom must therefore be suppressed. We discuss these issues separately.

## DISCUSSION

■■■

¶ 10. The trial court's findings of evidentiary or historical fact will not be overturned unless they are clearly erroneous. *State v. Martwick*, 2000 WI 5, ¶ 18, 231 Wis. 2d 801, 604 N.W.2d 552. Where the trial court is the finder of fact and there is conflicting evidence, the trial court is the ultimate arbiter of the credibility of witnesses. *Bank of Sun Prairie v. Opstein*, 86 Wis. 2d

669, 676, 273 N.W.2d 279 (1979). "[T]he weight to be attached to [the credibility of witnesses] is a matter uniquely within the discretion of the finder of fact." *Lellman v. Mott*, 204 Wis. 2d 166, 172, 554 N.W.2d 525 (Ct. App. 1996). "[W]e independently determine whether the historical or evidentiary facts establish exigent circumstances sufficient to satisfy the warrantless entry." *State v. Kryzaniak*, 2001 WI App 44, ¶ 12, 241 Wis. 2d 358, 624 N.W.2d 389.

### Consent to Enter the Apartment.

¶ 11. Whether police had consent to enter the apartment was disputed. The officers who testified at the *Miranda-Goodchild* hearing said, essentially, that Rochelle acknowledged that Ayala was in an upstairs bedroom of the apartment and that in response to the police request to go upstairs to get Ayala, she told them to "go, go." In addition, officers testified that Rochelle, Jose, Steven and Hernandez all later signed Officer Blaszak's notebook confirming their consent to the police search of the apartment. Rochelle testified at that same hearing that although she identified a picture she was shown and told officers that the person in the picture was there, she did not consent to their entry into her apartment. Rather, she contends that the officers simply came in with guns drawn. Rochelle agreed that she identified Ayala as the man in the photograph and that she pointed to the window of the upstairs room he was in. She also agreed that after Ayala's arrest, she signed the notebook giving the officers permission to search the apartment. Rochelle denied, however, that the officers asked permission to enter the residence and denied that she told them to "go."

¶ 12. The court found that "there was consistent testimony by the police as far as the consent issue," but did not find Rochelle's testimony credible. The trial court found that "based on what [Rochelle] said in court and how she said it, the court believes that she wasn't . . . very credible based upon the court's observation." The trial court concluded that there was consent to enter the apartment because after being shown the picture of Ayala, Rochelle said "I knew he was no good" to one officer and she consented to the officers going upstairs to get Ayala, telling them to "go, go, go."

¶ 13. The trial court is the arbiter of credibility of witnesses and weight of evidence. *See Opstein*, 86 Wis. 2d at 676. Although there is contrary evidence, there is credible evidence to support the trial court's findings of fact. We determine *de novo* whether the facts satisfy the constitutional requirement for voluntary consent. *See State v. Giebel*, 2006 WI App 239, ¶ 11, 297 Wis. 2d 446, 724 N.W.2d 402. Rochelle claims that she was initially intimidated by the presence of "eight to ten" officers at her door in uniform and plainclothes, with guns drawn. The officers appeared at noon. Rochelle was cooperative at all times on January 30. Rochelle never asked the police to leave, or objected in any way to their pursuit of Ayala. She did not testify that any police officer threatened her at any time. Rochelle also agrees that later, after Ayala was arrested and removed from the premises, she signed the officer's notebook confirming her consent to the search of her apartment. We conclude that the facts here, as found by the trial court, establish voluntary consent to police entry into the Cervantes' apartment.

### *Warrantless Entry into the Bedroom.*

¶ 14. Ayala contends that as an overnight guest, he had an expectation of privacy that was violated when police officers entered his room without a warrant. Ayala was staying in Rochelle's apartment with the permission of Rochelle's son, Steven. Steven testified that he saw Ayala in the tavern below the apartment around midnight on January 29. Steven knew Ayala through Steven's brother, Ricardo, who no longer lived in the apartment. Ayala asked Steven if he could spend the night because he had been locked out of his house and had nowhere to go. Steven agreed, took Ayala upstairs, and showed him to Ricardo's room. Steven then went back downstairs. Rochelle testified she had discovered Ayala asleep in the bedroom earlier in the day when she peeked in the door that was open four or five inches. She did not wake him or ask him to leave.

¶ 15. The Supreme Court has held that an invited overnight guest has a reasonable expectation of privacy on a premises occupied for the night that is protected by the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. 91, 96–100 (1990) ("[A person's] status as an overnight guest is alone enough to show that [the person] had an expectation of privacy in the home that society is prepared to recognize as reasonable."). The State does not dispute that, as an overnight guest at the apartment, Ayala had a legitimate expectation of privacy under the Fourth Amendment. Nor does any party contend that Ayala consented to police entry into the bedroom. Thus the warrantless entry into the bedroom occupied by Ayala is illegal unless otherwise justified.

### *Exigent Circumstances.*

¶ 16. However, an exception to the Fourth Amendment warrant requirement is the existence of exigent circumstances. " '[A] warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or other persons inside or outside the dwelling.' " *Id.*, 495 U.S. 91 at 100 (citations omitted). "[I]n assessing the risk of danger, the gravity of the crime and likelihood that the suspect is armed should be considered." *Id.*

¶ 17. Wisconsin has also recognized that it would be unreasonable and contrary to public policy in certain exigent circumstances to bar law enforcement officers at the door. *See State v. Richter*, 2000 WI 58, ¶ 28, 235 Wis. 2d 524, 612 N.W.2d 29. A warrantless entry into a home in order to conduct a search, seizure or arrest, absent a showing of exigent circumstances or consent, violates a person's Fourth Amendment right against unlawful searches and seizures. *See State v. Smith*, 131 Wis. 2d 220, 226–27, 388 N.W.2d 601 (1986). Our supreme court has recognized "four factors which, when measured against the time needed to obtain a warrant, would constitute the exigent circumstances required for a warrantless entry: (1) [a]n arrest made in 'hot pursuit,' (2) a threat to safety of a suspect or others, (3) a risk that evidence would be destroyed, and (4) a likelihood that the suspect would flee." *Id.* at 229. Review of whether exigent circumstances exist is to be "directed by a flexible test of reasonableness under the totality of the circumstances." *Id.* However, the test is "an objective one: Whether a police officer under the

circumstances known to the officer at the time reasonably believes that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of the suspect's escape." *Id.* at 230. We weigh the urgency of the officer's need to enter against the time needed to obtain a warrant. *Id.* at 228.

¶ 18. When officers arrived at the Cervantes residence, they had probable cause to arrest Ayala for the Milford homicide and the three related armed robberies.[5] Various factors created probable cause: (1) there had been what appeared to be an intentional homicide using a gun; (2) officers had information from the other robbery/homicide participants that Ayala was the shooter; (3) Ayala was believed by officers to be a Latin Kings gang member; (4) the weapon used in the homicide had not been recovered, leading officers to believe Ayala might still have the gun in his possession; (5) the gun might be evidence of a crime; (6) if Ayala possessed the missing gun, it put the officers at risk of being shot by Ayala if they announced themselves or asked Ayala for consent to enter the bedroom; (7) the tavern below the apartment was frequented by Latin King members; (8) Rochelle operated the tavern below the apartment; and (9) because there were civilians in the apartment as well as the tavern below, all were at risk if Ayala began shooting while police procured a warrant.

¶ 19. We also note that a delay in obtaining a warrant might have facilitated an escape, or an escape attempt by Ayala, possibly with the assistance of his acquaintances who were still in the apartment or persons unknown in the tavern. In considering the factors

[5] *See supra* note 3.

and objective test described in *Smith,* we conclude that the officers "reasonably believe[d] that delay in procuring a warrant would gravely endanger life or risk destruction of evidence or greatly enhance the likelihood of [Ayala's] escape." *See id.,* 131 Wis. 2d at 230. Had the officers waited for a warrant to enter the bedroom while guarding the slightly open door of the bedroom they reasonably believed an armed and dangerous suspect to be in, both police and civilians either in the apartment or in the tavern below would have been at an unreasonable risk of injury had Ayala awakened and realized the circumstances. The alternative of the officers surrounding the building while waiting for a warrant was also not a viable solution for two reasons. First, the additional time needed to obtain enough police officers to secure the property (including the tavern) increased the risk that Ayala would awaken and attempt to escape. The commotion that additional law enforcement presence would cause would likely draw a crowd, make Ayala aware of the presence and intent of police, and increase the risk of injury to the officers and civilians if, as the officers suspected, Ayala was armed and/or attempted escape. Second, police uncertainty as to how many people might render assistance to Ayala increased their risk of injury, as well as the risk to civilians, had Ayala become aware of the circumstances during the delay required to obtain a warrant. We conclude that Ayala's arrest was lawful because the urgency reasonably perceived by the officers was compelling, and the danger they reasonably perceived for themselves and others if they did not move quickly was substantial. Based on all the circumstances known to a reasonable police officer at the time, exigent circumstances made the warrantless entry into the bedroom constitutionally permissible.

185

### *Suppression of Evidence obtained after Ayala's arrest.*

¶ 20. Ayala argues that the officers' acquisition of the gun and his statement made to officers after his arrest were direct results of an illegal search and should have been suppressed. Officers discovered the gun under the mattress Ayala slept on and acquired the gun shortly after the arrest. The gun was later identified as the same type of gun used to kill Milford. Ayala was arrested at 12:30 p.m. and was interviewed beginning at approximately 7:00 p.m. for approximately forty-four minutes before being *Mirandized*. Ayala made incriminating statements approximately an hour later.

¶ 21. If Ayala's arrest violated constitutional requirements, a search incident to that arrest would be illegal and fruits of that illegal search must be suppressed. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). *See also Wong Sun v. United States*, 371 U.S. 471, 485–86 (1963). However, we have determined that the arrest was legal. Consequently, police were entitled to conduct a protective sweep for the safety of themselves and others incident to the lawful arrest. *State v. Sanders*, 2008 WI 85, ¶ 32, 311 Wis. 2d 257, 752 N.W.2d 713. (The protective sweep doctrine takes effect "once law enforcement officers are inside an area, including a home. Once inside an area a law enforcement officer may perform a warrantless 'protective sweep,' that is, 'a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others.' ") (footnote and citation omitted). The disputed gun was found in that protective sweep. The trial court properly denied the motion to suppress the gun.

██

¶ 22. We now turn to the incriminating statements made by Ayala approximately eight hours after

186

his arrest, and approximately an hour after he had been *Mirandized*. Ayala argues that his statements must be suppressed because they were the result of his illegal arrest, and were insufficiently attenuated from the illegal arrest to become voluntary. Because, as we have held above, the arrest was lawful, Ayala's statements were not the result of an illegal arrest. Ayala makes no arguments on appeal otherwise challenging the voluntariness of the statements. An issue raised in the trial court but not argued in a party's appellate brief is deemed abandoned and will not be considered. *See State v. Ledger*, 175 Wis. 2d 116, 135, 499 N.W.2d 198 (Ct. App. 1993). The motion to suppress Ayala's statement was properly denied. For all the foregoing reasons, we affirm.

 *By the Court.*—Judgment affirmed.