# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP1609-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent, |
| |     v. |
| | Faith N. Reed, |
| |         Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 328, 897 N.W.2d 68
(2017 – unpublished)

| | |
|---|---|
| OPINION FILED: | December 7, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 7, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Monroe |
|   JUDGE: | J. David Rice |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ZIEGLER, J., concurs. |
|   DISSENTED: | ROGGENSACK, J., dissents. |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed and an oral argument by *Joseph Ehmann*, state public defender.

For the plaintiff-respondent, there was a brief filed by *Clayton P. Kawski*, assistant attorney general, *Scott E. Rosenow*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Clayton Kawski*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2016AP1609-CR
(L.C. No.  2015CM545)

STATE OF WISCONSIN                    :    IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent,**

    **v.**

**Faith N. Reed,**

      **Defendant-Appellant-Petitioner.**

**FILED**

**DEC 7, 2018**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed and cause remanded.*

¶1   SHIRLEY S. ABRAHAMSON, J.   This is a review of an unpublished decision of the court of appeals affirming a judgment of conviction of the Circuit Court for Monroe County, David Rice, Judge.[1]   The case was decided by one judge, Judge Brian Blanchard, pursuant to Wis. Stat. § 752.31(2)(f) (2015-

---

[1] State v. Reed, No. 2016AP1609-CR, unpublished slip op. (Wis. Ct. App. Mar. 23, 2017).

16).[2]  Faith Reed, the defendant, was convicted of possession of a controlled substance in violation of Wis. Stat. § 961.41(3g)(b) and bail jumping in violation of Wis. Stat. § 946.49(1)(a), both misdemeanors.

¶2  In the circuit court, Reed claimed that the officer's warrantless entry into her apartment, sometimes referred to here as Unit 206, violated her rights under the Fourth Amendment of the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.  Reed argued that the warrantless entry into her apartment was not justified under any of the well-recognized exceptions to the Fourth Amendment's warrant requirement.  Specifically, Reed contended that the officer did not have consent to enter her apartment and that exigent circumstances did not exist justifying entrance to her apartment.  Consequently, she argued that the evidence obtained during the searches of her apartment and her person should be suppressed.

¶3  The circuit court denied Reed's motion to suppress the evidence.  The circuit court concluded that the law enforcement officer had consent to enter Reed's apartment, that the consent was never revoked, and that exigent circumstances justified the officer's pushing open the apartment door.  The court of appeals affirmed the circuit court's denial of Reed's motion to suppress.  The court of appeals agreed with the circuit court

_____

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

2

that the officer had consent to enter Reed's apartment and that the consent was never revoked. The court of appeals did not address the issue of exigent circumstances.

¶4 The instant case presents the following issues: (1) whether the officer had consent to enter Reed's apartment; (2) if consent was initially given to the officer, whether that consent was revoked before the officer's entry into Reed's apartment; and (3) whether exigent circumstances justified the officer's pushing open Reed's apartment door.

¶5 We conclude as follows: (1) the law enforcement officer did not have consent to enter Reed's apartment; (2) even if the officer had initially been given consent to enter the apartment, which he was not, consent would have been unequivocally revoked before the officer's entry into the apartment; and (3) exigent circumstances did not justify the officer's opening Reed's apartment door.

¶6 The following principles of law apply in the instant case.

¶7 A warrantless search does not violate the Fourth Amendment of the United States Constitution or Article I, Section 11 of the Wisconsin Constitution if the search is conducted with consent[3] or is justified by exigent circumstances.[4]

---

[3] Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); State v. Johnson, 2007 WI 32, ¶16, 299 Wis. 2d 675, 729 N.W.2d 182.

[4] Payton v. New York, 445 U.S. 573, 590 (1980); State v. Dalton, 2018 WI 85, ¶39, 383 Wis. 2d 147, 914 N.W.2d 120.

3

¶8 Consent to search must be unequivocal and specific,[5] and it must be freely and voluntarily given.[6] Consent is not freely and voluntarily given if it is the result of mere "acquiescence to a claim of lawful authority."[7] Once given, consent may be revoked. Revocation of consent need not be communicated through particular "magic words," but intent to revoke consent must be made by unequivocal acts or statements.[8]

¶9 In the instant case, the law enforcement officer neither requested nor obtained consent to enter Reed's apartment. Kirk Sullivan, who was staying with Reed at her apartment and led the officer to Reed's apartment, never told the officer that the officer was allowed to enter the apartment. In leading the officer to the threshold of Reed's apartment, Sullivan was merely following the directives and commands of the officer. Sullivan's conduct falls far short of unequivocal and specific consent that was freely and voluntarily given.

---

[5] Andrews v. Hickman Cty., 700 F.3d 845, 854 (6th Cir. 2012); United States v. Chan-Jimenez, 125 F.3d 1324, 1328 (9th Cir. 1997); Gautreaux v. State, 52 Wis. 2d 489, 492, 190 N.W.2d 542 (1971).

[6] Bumper v. North Carolina, 391 U.S. 543, 549 (1968); State v. Johnson, 2007 WI 32, ¶16, 299 Wis. 2d 675, 729 N.W.2d 182.

[7] Bumper, 391 U.S. at 549; see also Johnson, 299 Wis. 2d 675, ¶16.

[8] United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005); State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810.

4

¶10 Moreover, even if Sullivan had initially given the officer consent to enter Reed's apartment (which, we emphasize, he did not), consent would have been unequivocally revoked when Sullivan opened the apartment door just enough to allow himself entry and attempted to shut the door behind him to prohibit the officer from entering the apartment.

¶11 Additionally, a warrantless search may also be justified by exigent circumstances.[9] "The objective test for determining whether exigent circumstances exist is whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life . . . or greatly enhance the likelihood of the suspect's escape."[10]

¶12 We conclude that no exigent circumstances justified the officer's pushing open Reed's apartment door. Under the circumstances known to the officer at the time he pushed the door open, there were no facts upon which to base a reasonable belief that the delay in procuring a search warrant would gravely endanger life or greatly enhance the likelihood of the suspect's escape.

¶13 Accordingly, we conclude that the searches at issue violated the United States and Wisconsin constitutions. We

---

[9] Payton, 445 U.S. at 590; Dalton, 383 Wis. 2d 147, ¶39.

[10] State v. Hughes, 2000 WI 24, ¶24, 233 Wis. 2d 280, 607 N.W.2d 621; see also Minnesota v. Olson, 495 U.S. 91, 100 (1990).

5

therefore reverse the decision of the court of appeals and remand the cause to the circuit court with instructions to suppress the challenged evidence and vacate Reed's convictions.

I

¶14 The following facts are drawn primarily from the body camera footage of Officer Steven Keller of the Tomah Police Department.

¶15 On December 13, 2015, at 1:20 p.m., Officer Keller was dispatched to 308 Murdock Street in Tomah, Wisconsin. Officer Keller was responding to a report of an altercation between two individuals that had taken place in the street. When Officer Keller arrived at the scene, he encountered two men later identified as Daniel Cannon and Kirk Sullivan. Officer Keller asked Cannon and Sullivan what was going on, and Cannon responded, "They were fighting over stupid shit."[11] Officer Keller asked, "Where are they?" Cannon pointed ahead, saying "One of them went back the house that way——" Cannon then turned around, but before he could say anything else, Officer Keller asked Cannon if he and Sullivan were involved in the altercation. Cannon responded, "We were trying to stop it."

¶16 Cannon then explained that "homeboy," referring to the other individual involved in the altercation, "went back to his

---

[11] As the officer later learned, "they" were brothers, Brandon and Jerome Harris, and the "stupid shit" they were fighting about was a pair of Air Jordan basketball shoes.

house just to cool off." By "his" house, Cannon was referring to Sullivan.

¶17 Officer Keller asked Cannon, "Which apartment they in?" Cannon said that "they" were in number 11. Dispatch[12] could be heard saying that as the parties to the altercation were leaving, a female and male in a white T-shirt went to "apartment number 11." Cannon was heard off-screen chuckling and saying, "Yep, they're in number 11."

¶18 Referring to the individual who went back to Sullivan's apartment to cool off, Cannon reappeared on screen and began talking to Officer Keller again, stating, "And he's——"

¶19 At this time, Officer Keller noticed that Sullivan, now a short distance away, was walking away towards his apartment building.

¶20 Officer Keller said loudly to Sullivan, "Hey, why don't you come back here. Don't just leave." Sullivan turned around and walked back towards Officer Keller with his hands in his pockets as Cannon reiterated that the other individual went back to Sullivan's apartment to cool off. After a few seconds, Officer Keller told Sullivan to "[k]eep your hands out of your pockets for me, OK?" Sullivan removed his hands from his pockets and showed his open palms to Officer Keller.

---

[12] For the sake of clarity, the instant opinion refers to voices heard over Officer Keller's radio as "Dispatch" unless otherwise indicated.

¶21 Cannon again reiterated that he and Sullivan were trying to defuse the situation when Sullivan, speaking for the first time, said "Yep." Cannon then explained to Officer Keller that the altercation was related to shoes. Cannon says "that was pretty much the whole argument," and that "they" were supposed to "sit there and watch football."

¶22 Officer Keller then asked Sullivan, "So you were involved with this?" Sullivan responded, "I was just trying to break it up. That's it."

¶23 Officer Keller then asked Cannon and Sullivan for identification. Describing Cannon and Sullivan as "witnesses," Officer Keller radioed their names to Dispatch for a warrant check. While waiting to hear back from Dispatch, Officer Keller confirmed with Cannon and Sullivan that the altercation was a verbal argument about shoes that never got physical.

¶24 As Cannon and Sullivan were describing the altercation in greater detail, another male officer could be heard on Officer Keller's radio speaking with a female officer. The male officer said that he and "Andy" were "not having any luck" at apartment number 11. The female officer responded, "I have a Jerome Harris at that location. Contact with him on November 11th. Reference: a warrant." As to Sullivan, the female officer commented, "Reference: a commitment." The male officer asked the female officer to "run Jerome" and "look for a Brandon——maybe same last name."

¶25 Officer Keller then asked Cannon and Sullivan, "Can you guys stick around this area for a moment?" Sullivan asked,

8

"You mean stand outside?" Officer Keller pointed to a nearby building and responded, "Well, do you want to hang out in this building?" In response, Sullivan laughed and said, "I was going to watch the game, I guess." Gesturing with his hands, Officer Keller responded, "Until we can get everything straightened out."

¶26 At this time, Cannon turned to Sullivan and said, "Well, cause he went to your house, he's at your apartment." Sullivan responded, "Yeah, he supposed to go to my——my apartment to watch football." Cannon then said to Officer Keller, "So, I mean, if you want to go with him and I can stand by where I live——" Officer Keller then asked Sullivan, "Who's at your house right now, one of the guys involved?" Cannon responded, "Yes." Sullivan said, "Yeah he's supposed to——he was supposed to come to my house. He's supposed to."

¶27 Officer Keller asked Sullivan, "All right, and he's over there right now?" Sullivan responded, "I——I don't know he was supposed to go." Cannon said that he saw Jerome head towards Sullivan's apartment building after the argument ended and that Jerome "might be there already."

¶28 Dispatch could be heard telling Officer Keller that Sullivan was on probation for battery, strangulation, and suffocation. Dispatch also told Officer Keller that Sullivan had contact restrictions with the defendant, Faith Reed.

¶29 Officer Keller asked Sullivan if "that" is where he was, referring to Reed's apartment. Sullivan said, "Mm-hm." Officer Keller asked, "Is she there?" Sullivan answered, "Yeah,

9

she's there." There was then some confusion among Sullivan, Officer Keller, and Dispatch about the specifics of Sullivan's contact restrictions with Reed, but eventually, it was established that Sullivan was not prohibited from in-person contact with Reed.[13]

¶30 Officer Keller asked Sullivan, "Who's over at your house right now that was involved with this? What's his name?" Sullivan responded, "Ah, Jerome. He was supposed to—he was supposed to go over there. I stood out here and me and him was talking about it."

¶31 The same male officer from before could again be heard stating over the radio that nobody was answering the door at apartment number 11. This male officer asked if they thought Jerome was in number 11 and Brandon took off. Officer Keller responded into his radio, "Kirk's advising that Jerome might be at his residence over here and the others in number 11 there." Officer Keller then asked, "Is it Brandon that was involved?" It is not clear to whom this question was directed, and nobody responded to it.

¶32 Officer Keller again confirmed with Cannon and Sullivan that the argument was verbal and not physical. Officer Keller then communicated that information into his radio. Over the radio, a male officer can be heard saying, "We're looking

---

[13] Sullivan's phone contact with Reed was restricted, not his in-person contact with Reed.

for Brandon Harris and Jerome Harris. You can run both of them——make sure they're not wanted——could be helpful."

¶33 Officer Keller then gestured towards an apartment building and said to Sullivan, "All right, let's go—ah—let's go look over——see if he's over there. If anything we could just talk to him." Officer Keller told Cannon that he was "good to go."

¶34 Officer Keller and Sullivan began walking towards Reed's apartment building with Sullivan walking to Officer Keller's left. As they walked, Dispatch could be heard saying that Jerome had two "body only" warrants, one of which was related to "operating while revoked." After about 30 seconds, Officer Keller told Sullivan, "Hey, do you want to step over here with me. I'm going to see if this other party's here." Sullivan then began to walk in front of Keller such that he was clearly visible in the body camera footage.

¶35 With Sullivan in front of Officer Keller, the two entered an unlocked entryway to a stairwell in the apartment building. They climbed a set of stairs to the second story of the building. At the top of the stairs was another unlocked door. Sullivan opened the door, exited the stairwell, and looked back while holding the door open for Officer Keller. Sullivan then led Officer Keller to Reed's apartment, Unit 206, about halfway down the hallway on the left. Just as they reached the threshold of Reed's apartment, Officer Keller stated into his radio, "Andy, I'll be in apartment number 206."

¶36 Sullivan briefly knocked on the door, opened the door just wide enough to facilitate his own entry into the apartment, began to shut the door behind him, and called out for Jerome.[14] The door to Unit 206 was inches away from shutting when Officer Keller pushed open the door, stating, "Hey, don't just walk in there."[15] Sullivan, another man later identified as Jerome Harris, and a woman later identified as the defendant, Faith Reed, could be seen inside the apartment after Officer Keller pushed open the door but before he entered the apartment. Sullivan could be seen trying to conceal something that was on the kitchen counter. Officer Keller entered the apartment and subsequently discovered marijuana on the counter.

¶37 Reed was arrested for possession of marijuana. During the booking process, a single Adderall pill was found in Reed's sock. Reed was charged with one count each of possession of an illegally obtained prescription drug in violation of Wis. Stat. § 450.11(7)(h), possession of dextroamphetamine sulfate (Adderall) in violation of Wis. Stat. § 961.41(3g)(b),

---

[14] The circuit court found that it was ambiguous whether Sullivan was shutting the apartment door or if it was another occupant of the apartment. This finding is clearly erroneous. Officer Keller's body camera clearly shows that it was Sullivan who was attempting to shut the apartment door behind him.

[15] The court of appeals stated that Jerome said "Hey, don't just walk in like that." This finding is also clearly erroneous. In the body camera footage, Officer Keller, not Jerome, could clearly be heard saying, "Hey, don't just walk in there" as Sullivan entered the apartment and began shutting the door behind him.

possession of THC as a party to a crime in violation of Wis. Stat. § 961.41(3g)(e), and bail jumping in violation of Wis. Stat. § 946.49(1)(a).

¶38  On February 9, 2016, Reed filed a motion to suppress the evidence on the basis that the warrantless searches violated her rights under the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.  A hearing was held on March 15, 2016, at which Officer Keller testified and the prosecutor played relevant portions of Officer Keller's body camera footage.

¶39  At the hearing, Officer Keller admitted that Sullivan had not given him permission to go into Unit 206.  Officer Keller testified that Sullivan "did not tell me that I had to stay out of the apartment nor did he tell me to just come right in, either."  Officer Keller testified that "[a]t no point did [Sullivan] tell me I could not follow him into the residence." Officer Keller further testified that he pushed opened the door to the apartment in part out of concern for his own safety.

¶40  The circuit court denied Reed's motion to suppress. The circuit court concluded that "by his conduct Mr. Sullivan freely and voluntarily implied that the officer could follow him to [Unit 206] and that he was going to locate and identify Mr. Harris who was one of the suspects in connection with this altercation so that the officer could talk with him."  The circuit court found that it was not clear who closed the door

13

(i.e., either Sullivan or another occupant of Reed's apartment),[16] and that from Officer Keller's perspective, it would have been "ambiguous" why the door was shutting. The circuit court concluded that "there was nothing about [Sullivan's] entry into the room that revoked——revoked that consent that the officer follow him." The circuit court also concluded that "under the circumstances that the officer was in an isolated location without anyone else there to back him up dealing with individuals one of whom was on probation, had a warrant for his arrest who had just been in an altercation, I think it was reasonable for him to push the door partially open to make sure he knew who was in front of him and what was going on."

¶41 After the motion to suppress was denied, Reed pleaded no contest to possession of a controlled substance in violation of Wis. Stat. § 961.41(3g)(b) and bail jumping in violation of Wis. Stat. § 946.49(1)(a). Reed appealed her convictions to the court of appeals, arguing that the circuit court erroneously denied her motion to suppress.

¶42 The court of appeals, Judge Brian Blanchard sitting alone pursuant to Wis. Stat. § 752.31(2)(f), affirmed the circuit court's denial of Reed's motion to suppress. With regard to whether Sullivan provided consent for Officer Keller

---

[16] This finding is clearly erroneous.

to enter Unit 206, the court of appeals concluded that Sullivan provided consent:

> [T]o a typical, reasonable person, both of the following were unequivocally and specifically expressed: (1) Keller's request that Sullivan permit Keller to talk to Jerome in Unit 206, including proposing that "we could just talk to him," and (2) Sullivan's consent, expressed through an extended course of conduct, that Keller enter Unit 206.[17]

¶43 The court of appeals disagreed with the circuit court's finding that it was ambiguous who closed the door. The court of appeals stated that "[i]t is clear that neither Jerome nor Reed pushed on the door from the inside," such that "the only logical deduction from the video is that as Sullivan entered Unit 206 he applied slight to moderate pressure to the make [sic] the door slowly swing toward the closed position."[18]

¶44 The court of appeals characterized Sullivan's attempted closing of the door as "a nuanced attempt to momentarily _delay_ Keller's entrance, by slipping into the apartment and giving the door a soft backward push."[19] The court of appeals acknowledged that Sullivan's "last-second, soft backwards push on the door . . . suggests the possibility that Sullivan had last-second concern about agreeing to allow Keller to enter Unit 206[,]" but ultimately, the court of appeals

---

[17] _Reed_, No. 2016AP1609-CR, ¶25.

[18] _Id._, ¶12 n.3.

[19] _Id._, ¶13.

15

concluded that "[t]his nuanced possible delaying tactic was an equivocal act."[20]

¶45  Reed petitioned this court for review in April 2017. The State did not file a formal response.  After being ordered to do so by this court, the State filed a response in August 2017.  In its response, the State agreed with Reed that Sullivan did not give unequivocal and specific consent for Officer Keller to enter the apartment.   Rather, according to the State, Sullivan merely acquiesced to Officer Keller's request to broker a meeting with Jerome, and Sullivan did so by leading Officer Keller through areas that Officer Keller did not need consent to enter:  a parking lot, the unlocked exterior door to a multi-unit apartment building, a set of stairs, and an unlocked hallway.  The State wrote in its response that when they reached the apartment door, Sullivan "did nothing to suggest that entry was permitted.  He did the opposite.  Sullivan knocked, opened the door only wide enough to enter, slipped in, and attempted to push the door close[d]——indicating that he did not want Officer Keller to follow him."

¶46  The State agreed with Reed that the court of appeals' decision should be reversed, recommending that this court summarily reverse and remand the cause to the circuit court with an instruction to suppress the challenged evidence.

---

[20] Id., ¶30.

¶47 In October 2017, this court granted Reed's petition for review of the court of appeals' decision and remanded the cause to the court of appeals "for reconsideration in light of the State's concession in its response to Ms. Reed's petition for review." Chief Justice Roggensack dissented joined by Justice Ziegler and Justice Gableman, writing that the State's concession appeared to be factually unwarranted and inconsistent with its position in the circuit court and court of appeals.

¶48 Nine days after we remanded the cause to the court of appeals for reconsideration, the court of appeals, Judge Blanchard again sitting alone pursuant to Wis. Stat. § 752.31(2)(f), issued an order refusing to reconsider the case. The court of appeals' order reads in full as follows:

> Following the supreme court's October 10, 2017 order, I asked the parties to inform me whether new or supplemental briefing is necessary for purposes of resolving the reconsideration issue or instead whether I may rely on their submissions in the supreme court. They inform me that no new submissions are necessary.
>
> I am not persuaded by the State's new legal argument on appeal and therefore do not accept the State's new concession.
>
> IT IS ORDERED that reconsideration is denied.

¶49 In November 2017, Reed again petitioned this court for review, "reviv[ing] the issues raised in her initial petition for review." As it did in response to Reed's first petition for review, the State responded to Reed's second petition by agreeing that Sullivan did not give express or implied consent

17

to enter Reed's apartment and that reversal of the court of appeals' decision was necessary.

## II

¶50 We begin by setting forth the applicable standard of review of the court of appeals' decision affirming the circuit court's denial of Reed's motion to suppress evidence.

¶51 Whether evidence should be suppressed is a question of constitutional fact.[21] When presented with a question of constitutional fact, this court engages in a two-step inquiry. First, we review the circuit court's findings of historical fact under the clearly erroneous standard.[22] Second, we independently apply constitutional principles to these historical facts.[23]

## III

---

[21] Johnson, 299 Wis. 2d 675, ¶13; State v. Knapp, 2005 WI 127, ¶19, 285 Wis. 2d 86, 700 N.W.2d 899.

[22] Johnson, 299 Wis. 2d 675, ¶13.

The parties disagree about whether to apply the clearly erroneous standard or the de novo standard to the circuit court's findings of historical fact, given that the circuit court's findings were based on Officer Keller's body camera footage. See State v. Jimmie R.R., 2000 WI App 5, ¶39, 232 Wis. 2d 138, 606 N.W.2d 196 (1999) (when the only evidence on a factual question is reflected in a video recording, the court of appeals is in the same position as the circuit court to determine a question of law based on the recording).

We decline to address this disagreement because doing so is unnecessary in the instant case. As we explained above, even under the more deferential clearly erroneous standard, we reject the circuit court's finding with respect to who closed the apartment door.

[23] Johnson, 299 Wis. 2d 675, ¶13.

¶52 The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution prohibiting unreasonable searches and seizures guide our analysis.[24] In particular, the "physical entry of the home" has been described by the United States Supreme Court as "the chief evil against which the wording of the Fourth Amendment is directed."[25]

¶53 In Boyd v. United States, 116 U.S. 616, 635 (1886), the United States Supreme Court issued the following guidance: "It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon."[26]

¶54 Because "the warrant procedure minimizes the danger of needless intrusions" by the government, "[i]t is a 'basic principle of Fourth Amendment law' that searches and seizures

---

[24] U.S. Const. amend. IV; Wis. Const. art. I, § 11; State v. Eason, 2001 WI 98, ¶16, 245 Wis. 2d 206, 629 N.W.2d 625 (recognizing the protections under both the United States and Wisconsin constitutions).

[25] United States v. United States District Court, 407 U.S. 297, 313 (1972); see also Payton, 445 U.S. at 585; State v. Douglas, 123 Wis. 2d 13, 17-18, 365 N.W.2d 580 (1985) ("The courts, including this one, have scrutinized with the greatest care claims by the state to the use of evidence seized in warrantless searches of one's home").

[26] See also Douglas, 123 Wis. 2d at 21 ("That principle [announced in Boyd] is no less true today than it was a century ago. The fourth amendment has been liberally construed to protect the security of person and property when exceptions to the warrant requirement are sought.").

inside a home without a warrant are presumptively unreasonable."[27] However, both the United States and Wisconsin constitutions have "jealously and carefully drawn" exceptions to their warrant requirements.[28]

¶55 The instant case presents issues related to two of those well-recognized exceptions to the warrant requirement: consent[29] and exigent circumstances.[30]

A

¶56 We now address whether Officer Keller obtained consent to enter Reed's apartment.

¶57 Consent to search need not be expressed by words. Consent may be given or inferred through gestures or conduct.[31] Whether consent is verbal or inferred from one's actions,

---

[27] Payton, 445 U.S. at 586 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 477-78 (1971)); Johnson v. United States, 333 U.S. 10, 13-14 (1948); see also Douglas, 123 Wis. 2d at 18.

[28] Jones v. United States, 357 U.S. 493, 499 (1958); Douglas, 123 Wis. 2d at 22.

[29] Schneckloth, 412 U.S. at 219; Johnson, 299 Wis. 2d 675, ¶16.

[30] Kentucky v. King, 563 U.S. 452, 460 (2011); Dalton, 383 Wis. 2d 147, ¶39.

[31] United States v. Castellanos, 518 F.3d 965, 970 (8th Cir. 2008); State v. Phillips, 218 Wis. 2d 180, 197, 577 N.W.2d 794 (1998).

consent must be unequivocal and specific.[32] Consent to a search should not, however, be lightly inferred.[33]

¶58 Consent must be freely and voluntarily given; it is not enough to show mere "acquiescence to a claim of lawful authority."[34] The State bears the burden of proving consent by clear and convincing evidence.[35]

¶59 In the instant case, the State failed to meet its burden.

¶60 Simply put, Sullivan's conduct throughout the entire interaction between him and Officer Keller, including leading Officer Keller to the threshold of the apartment and entering the apartment, does not imply that Sullivan granted Officer Keller consent to enter Unit 206. Sullivan unequivocally demonstrated that he did not consent to Officer Keller entering Reed's apartment when Sullivan attempted to prohibit Officer Keller's entry by shutting the apartment door behind him.

¶61 Sullivan's conduct is more properly characterized as "mere acquiescence" to Officer Keller's show of authority than

---

[32] Andrews v. Hickman County, 700 F.3d 845, 854 (6th Cir. 2012); Chan-Jimenez, 125 F.3d at 1328; Gautreaux, 52 Wis. 2d at 492.

[33] United States v. Como, 340 F.2d 891, 893 (2nd Cir. 1965); State v. Rodgers, 119 Wis. 2d 102, 107, 349 N.W.2d 453 (1984); Kelly v. State, 75 Wis. 2d 303, 316, 249 N.W.2d 800 (1977).

[34] Bumper, 391 U.S. at 549; Johnson, 299 Wis. 2d 675, ¶16.

[35] United States v. Mapp, 476 F.2d 67, 77 (2nd Cir. 1973); State v. Tomlinson, 2002 WI 91, ¶21, 254 Wis. 2d 502, 648 N.W.2d 367.

21

as free and voluntary actions evincing consent.[36] Throughout the entire interaction, Sullivan was simply following Officer Keller's orders.

¶62 It is noteworthy that at the very beginning of the interaction, Sullivan tried to leave without talking to Officer Keller. In fact, Sullivan had gotten several yards away before Officer Keller noticed that Sullivan was leaving, prompting him to loudly tell Sullivan, "Hey, why don't you come back here. Don't just leave." Without a word, Sullivan complied with Officer's Keller's directive. As Sullivan was returning, Officer Keller said to Sullivan, "Keep your hands out of your pockets for me, OK?" Again, without a word, Sullivan complied with Officer Keller's directive and showed Officer Keller his palms.

¶63 After learning that Jerome might be at Unit 206, Officer Keller said to Sullivan, "All right, let's go——ah——let's go look over, see if he's over there. If anything we could all just kind of talk to him."

¶64 Given Sullivan's pattern of complying with Officer Keller's previous commands, it is unsurprising that Sullivan did not verbally respond to Officer Keller's statement and instead simply departed towards the apartment building with Officer Keller in tow.

---

[36] See Bumper, 391 U.S. at 548; Johnson, 299 Wis. 2d 675, ¶16 & n.6.

22

¶65 None of this conduct, viewed together or in isolation, implies that Officer Keller had Sullivan's consent to enter Unit 206. After reaching the second floor of the apartment building, Sullivan held the door between the stairwell and the hallway open behind him, implying that Officer Keller was to follow Sullivan into the hallway. However, Sullivan unequivocally implied that Officer Keller did not have his consent to enter the apartment when Sullivan attempted to prohibit Officer Keller's entry by attempting to shut the apartment door in Officer Keller's face.

¶66 Moreover, we observe that Officer's Keller's statement was not an unequivocal request to enter Unit 206. There is nothing about Officer Keller's statement that suggests that he meant to physically enter Unit 206——the statement could just as readily imply that Officer Keller intended to follow Sullivan to the threshold of Unit 206 while Sullivan entered to see if Jerome was present in the apartment.

¶67 We further observe that Officer Keller's statement was not a request at all. Officer Keller was not asking a question or asking for Sullivan's permission to accompany him into Unit 206.[37] There is no reasonable way to interpret Officer Keller's statement other than as a directive to Sullivan to lead Officer Keller to Unit 206, a directive with which Sullivan complied as he had complied with Officer Keller's previous commands.

---

[37] See Johnson, 299 Wis. 2d 675, ¶19 ("As the record indicates, neither [Officer] Stillman nor [Officer] Dummer asked for Johnson's permission to search the car.").

23

¶68 In light of all of the facts and circumstances presented in the instant case, we conclude that Officer Keller did not have consent to enter Reed's apartment.

B

¶69 We could end our consent analysis here, having concluded that consent to enter Reed's apartment was never given. However, in light of both the circuit court and court of appeals' conclusions with regard to the revocation of consent, we address whether consent would have been revoked had Sullivan initially given consent (which, we emphasize, he did not).

¶70 We conclude that Sullivan would have unequivocally withdrawn consent, had he initially given it, by attempting to shut the door to the apartment, prohibiting Officer Keller's entry.

¶71 Once given, consent to search may be withdrawn. "Withdrawal of consent need not be effectuated through particular 'magic words,' but an intent to withdraw consent must be made by unequivocal act or statement."[38] "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness——what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[39]

---

[38] United States v. Gray, 369 F.3d 1024, 1026 (8th Cir. 2004); State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810.

[39] Florida v. Jimeno, 500 U.S. 248, 251 (1991); Wantland, 355 Wis. 2d 135, ¶33.

¶72 Examples of unequivocal acts or statements sufficient to constitute withdrawal of consent have included slamming shut the trunk of a car during a search[40] and grabbing back the item to be searched from the officer.[41]

¶73 In the instant case, although Sullivan never provided consent for Officer Keller to enter Unit 206, Sullivan would have unequivocally revoked consent, had it initially been given, by attempting to shut the door to the apartment before Officer Keller pushed it open.

¶74 Immediately prior to arriving at the threshold of Unit 206, Sullivan led Officer Keller out of a stairwell and into the hallway of the apartment building. In doing so, Sullivan looked back and held the door between the stairwell and the hallway open behind him, as one does when he or she anticipates someone will be following him or her through the doorway.

¶75 Sullivan's actions between the stairwell and the hallway are in stark contrast to Sullivan's actions after arriving at the threshold of Unit 206. Upon arriving at Unit 206, Sullivan briefly knocked on the door, opened the door just enough to facilitate his own entry into the apartment, began to close the door behind him with Officer Keller still in the hallway, and called out for Jerome. The door was within inches

---

[40] See United States v. Flores, 48 F.3d 467, 468 (10th Cir. 1995).

[41] See United States v. Ho, 94 F.3d 932, 934 (5th Cir. 1996); see also Wantland, 355 Wis. 2d 135, ¶34 (citing Flores and Ho).

of being fully closed when Officer Keller pushed the door open, stating, "Hey, don't just walk in there."

¶76 The body camera footage is unambiguous and conclusive. There is perhaps no action that could more clearly communicate "Do Not Enter" than attempting to shut a door in someone's face. Shutting the door is akin to slamming shut the trunk of a car during a search or grabbing back the item to be searched by the officer, actions that courts have recognized as unequivocal revocations of consent to search.[42]

C

¶77 We conclude by addressing whether exigent circumstances existed that justify Officer Keller's pushing open of Reed's apartment door.

¶78 Both this court and the United States Supreme Court have identified several exigencies that may justify a warrantless search of a home. We have explained that "[t]he objective test for determining whether exigent circumstances exist is whether a police officer, under the facts as they were known at the time, would reasonably believe that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of the suspect's escape."[43]

---

[42] See Wantland, 355 Wis. 2d 135, ¶34.

[43] Hughes, 233 Wis. 2d 280, ¶24; see also Olson, 495 U.S. at 100; Coolidge, 403 U.S. at 478; Dalton, 383 Wis. 2d 147, ¶39.

26

¶79 It is the State's burden to prove that the warrantless search at issue was justified by exigent circumstances.[44]

¶80 The State argues that Officer Keller's pushing open Reed's apartment door without a warrant was justified because (1) Officer Keller reasonably believed that Sullivan and Jerome were dangerous; and (2) Officer Keller could reasonably have thought that Jerome would likely try to escape.

¶81 The totality of the circumstances known to Officer Keller at the time he pushed open door to Reed's apartment does not establish exigent circumstances. Officer Keller was repeatedly told that the altercation that he was investigating had been verbal, not physical, in nature. Officer Keller knew that the altercation was over. He knew that Brandon and Jerome Harris left in opposite directions, i.e., that they were no longer together, and that Jerome had been "cooling off" in Sullivan's apartment.

¶82 Furthermore, Sullivan was cooperating with Officer Keller throughout Officer Keller's investigation. Sullivan returned to Officer Keller and removed his hands from his pockets when directed to do so by Officer Keller. He answered all of Officer Keller's questions. Although the State points out that Sullivan was on probation for violent crimes, it fails to connect that fact with its assertion that it was objectively reasonable for Officer Keller to believe that Sullivan had a

---

[44] Coolidge, 403 U.S. at 474-75; State v. Richter, 2000 WI 58, ¶26, 235 Wis. 2d 524, 612 N.W.2d 29.

27

weapon or would suddenly become violent. Indeed, such a broad assertion would appear to create a categorical exigent circumstances exception.[45]

¶83 Likewise, there was no objective, reasonable basis for believing that Jerome had a weapon or would become violent. Although Jerome had two outstanding body warrants, Officer Keller knew that at least one of those warrants stemmed from a non-violent crime, and there was no indication that Jerome posed any greater risk of attempting to evade arrest than any other individual with an outstanding warrant.

¶84 An outstanding warrant for a suspect's arrest, by itself, does not give rise to exigent circumstances justifying the warrantless entry into someone else's home in which the suspect does not reside.[46]

¶85 The State relies on State v. Kirby, 2014 WI App 74, 355 Wis. 2d 423, 851 N.W.2d 796, for its assertion that exigent circumstances justified Officer Keller's pushing open the door to Unit 206.

---

[45] See Missouri v. McNeely, 569 U.S. 141, 152-58 (2013) (rejecting categorical exigency rule in drunk driving cases premised on the dissipation of alcohol in the suspect's blood).

[46] See Payton, 445 U.S. at 603 ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.") (emphasis added); State v. Delap, 2018 WI 64, ¶29-32, 382 Wis. 2d 92, 913 N.W.2d 175.

28

¶86 In Kirby, two police officers went to an apartment to question young men who had reportedly been fighting outside.[47] One officer had learned prior to arriving at the apartment that "the main aggressor" in the fight had threatened "to come back to the area with a gun."[48] The door to the apartment unit was open, and five men were inside.[49] When the officers were about to leave after speaking with the men, one officer received a phone call and learned that an informant had told police that if there was a black backpack in the apartment, it had a handgun and sawed-off shotgun inside.[50] The officer then noticed a black backpack, opened it, and found a sawed-off shotgun.[51] The court of appeals held that the possible threat to officer safety justified the officer's search of the backpack, and that "even had the officer been outside the threshold of the apartment," the officer would have been justified in entering it to look for the backpack.[52]

¶87 The State also argues that State v. Ayala, 2011 WI App 6, 331 Wis. 2d 171, 793 N.W.2d 511, supports its position that

_____

[47] State v. Kirby, 2014 WI App 74, ¶¶4-5, 355 Wis. 2d 423, 851 N.W.2d 796.

[48] Id., ¶3.

[49] Id., ¶6.

[50] Id., ¶9.

[51] Id., ¶12.

[52] Id., ¶¶18-19.

exigent circumstances justified Officer Keller's pushing open Reed's apartment door.

¶88 In Ayala, police officers lawfully entered the defendant's bedroom without a warrant because of the chance that he could try to escape or violently resist arrest.[53] Noting that "the risk of danger, the gravity of the crime[,] and the likelihood that the suspect is armed" are all proper considerations in determining whether exigent circumstances existed, the court of appeals summarized what was known to the officers when they entered the defendant's bedroom without a warrant:

> (1) [T]here had been what appeared to be an intentional homicide using a gun; (2) officers had information from the other robbery/homicide participants that Ayala was the shooter; (3) Ayala was believed by officers to be a Latin Kings gang member; (4) the weapon used in the homicide had not been recovered, leading officers to believe Ayala might still have the gun in his possession; (5) the gun might be evidence of a crime; (6) if Ayala possessed the missing gun, it put the officers at risk of being shot by Ayala if they announced themselves or asked Ayala for consent to enter the bedroom; (7) the tavern below the apartment was frequented by Latin King members; (8) [a resident of the apartment] operated the tavern below the apartment; and (9) because there were civilians in the apartment as well as the tavern below, all were at risk if Ayala began shooting while police procured a warrant.[54]

---

[53] State v. Ayala, 2011 WI App 6, ¶¶18-19, 331 Wis. 2d 171, 793 N.W.2d 511.

[54] Ayala, 331 Wis. 2d 171, ¶¶16-18.

¶89 In the instant case, Officer Keller never received information suggesting that either Sullivan or Jerome was armed or dangerous. There was nothing to suggest that Officer Keller was being led to a known gang hangout or that gangs were in any way involved in his investigation. Officer Keller was investigating a verbal argument in the street between two brothers about shoes, not an intentional homicide using a gun. In sum, neither Kirby nor Ayala presents factual circumstances remotely similar to those in the instant case. The State's reliance on these cases is, therefore, misplaced.

¶90 The State points out that Officer Keller found it suspicious that Sullivan would knock on the door to his own apartment, and that in doing so, Sullivan may have been attempting to alert those inside the apartment that he was accompanied by a police officer. The most succinct response to the State's argument is, so what if Sullivan was attempting to alert those inside that he was accompanied by a police officer? Police officers frequently knock on doors and announce their presence and identities.

¶91 Indeed, the police are generally required to announce their presence and their intent to search before entering closed premises, and this obligation only "gives way when officers 'have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of

31

the crime by, for example, allowing the destruction of evidence."[55]

¶92 Simply put, there were no circumstances known to Officer Keller at the time he pushed open the apartment door that would give rise to a reasonable belief that he was in danger. Law enforcement is an inherently dangerous profession. In the course of investigating a crime, any individual _might_ have a weapon, and any individual _could_ attempt to flee.

---

[55] <u>United States v. Banks</u>, 540 U.S. 31, 36 (2003) (quoting <u>Richards v. Wisconsin</u>, 520 U.S. 385, 394 (1997)); <u>see also</u> <u>Wilson v. Arkansas</u>, 514 U.S. 927, 931-32 (1995).

The Supreme Court recently summarized the privacy rights enjoyed by individuals in their homes:

> When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak. When the police knock on a door but the occupants choose not to respond or to speak, "the investigation will have reached a conspicuously low point," and the occupants "will have the kind of warning that even the most elaborate security system cannot provide." And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.

<u>King</u>, 563 U.S. at 469-70.

32

However, these generalized concerns for safety and risk of flight are not enough to give rise to exigent circumstances.[56]

¶93 The test is whether there are objective facts known to the officer that would reasonably lead him to believe that the delay caused by obtaining a warrant would gravely endanger life or greatly enhance the likelihood of the subject's escape.[57] Finding the existence of exigent circumstances in the instant case would allow the exigent circumstances exception to swallow the warrant requirements of the United States and Wisconsin constitutions.

IV

¶94 We conclude that the law enforcement officer in the instant case did not have consent justifying his warrantless entry into Reed's apartment. Even if consent had initially been given, which it was not, consent would have been unequivocally revoked before the officer breached the threshold of the apartment. Finally, we conclude that no exigent circumstances justified the officer's warrantless searches.

---

[56] The consequence of the State's reasoning appears to result in categorical exigencies. For example, if the subject has an outstanding arrest warrant, exigent circumstances would exist because the subject might try to violently resist arrest or flee. Additionally, if the subject has ever been convicted of a violent crime, exigent circumstances would exist because he might become violent towards the police officer. "[T]he Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." McNeely, 569 U.S. at 158.

[57] Hughes, 233 Wis. 2d 280, ¶24.

¶95 Accordingly, we reverse the court of appeals and remand the cause to the circuit court with instructions to suppress the challenged evidence and vacate Reed's convictions.

*By the Court.*—The decision of the court of appeals is reversed and the cause is remanded to the circuit court.

¶96 ANNETTE KINGSLAND ZIEGLER, J. *(concurring)*. I agree with the result the majority reaches. I concur and write separately because I disagree with the majority's assertion that consent to a search "must be unequivocal and specific." Majority op., ¶¶8, 57 (relying on Gautreaux v. State, 52 Wis. 2d 489, 492-93, 190 N.W.2d 542 (1971)). What the majority does not make clear is that Gautreaux has been "explained" by this court in State v. Rodgers, 119 Wis. 2d 102, 114, 349 N.W.2d 453 (1984). In Rodgers this court noted that Gautreaux was decided a year and a half before the United States Supreme Court precedent set by Schneckloth v. Bustamonte, 412 U.S. 218 (1973). Id. We then adopted the test from Schneckloth. See State v. Wantland, 2014 WI 58, ¶¶20, 23-24, 355 Wis. 2d 135, 848 N.W.2d 810; see also State v. Brar, 2017 WI 73, ¶26, 376 Wis. 2d 685, 898 N.W.2d 499. Schneckloth does not use the phrase "unequivocal and specific." Instead, in Schneckloth the Supreme Court made clear that for consent to operate as a valid exception to the warrant requirement, two conditions must be satisfied: consent must be (1) freely and voluntarily given, (2) by an individual having either actual or apparent authority over the place to be searched. 412 U.S. at 219, 222. In the interest of clarity and consistency we should use the language from Schneckloth.

¶97 Moreover, the majority opinion's use of "unequivocal and specific" is not explained, interpreted, or analyzed. Perhaps this is because it is used incidentally and is entirely unnecessary to this case. The majority opinion correctly

1

states, "Sullivan's conduct is more properly characterized as 'mere acquiescence' to Officer Keller's show of authority than as free and voluntary actions evincing consent." Majority op., ¶61. In other words, the majority is correct to state that consent was not freely and voluntarily given under the test of Schneckloth. Neither Sullivan's words nor his actions establish free and voluntary consent. As is apparent from this and other cases that use the phrase "unequivocal or specific," the test continues to be whether consent was freely and voluntarily given by one with the authority to so consent. Here, no such consent was given in the first instance. In short, the additional language is unnecessary to the Schneckloth analysis we are to apply. I would not use it.

¶98 More specifically, the majority opinion largely and inexplicably relies on Gautreaux for the proposition that consent must be "unequivocal and specific." Gautreaux, 52 Wis. 2d at 492. To be clear, Gautreaux is distinguishable from the case now before the court. In Gautreaux there was no dispute that the consent was unequivocal and specific. Rather, the focus in Gautreaux was whether consent was voluntary. Gautreaux is not particularly instructive concerning the issue before our court, which is, in my view, whether consent was given in the first instance. In my view, it was not.

¶99 Furthermore, our court has distanced itself from the "unequivocal and specific" language noting that in Gautreaux, the court was without the benefit of knowing what test the United States Supreme Court would provide in Schneckloth.

2

*Rodgers*, 119 Wis. 2d at 114 ("The words used in *Gautreaux* do not differ in meaning from a voluntary consent as defined in *Schneckloth*. There is nothing in sec. 968.07, Stats., nor Art. I, secs. 8 and 11 that requires the definition of consent for entry into the home to be any different than the definition for consent under the fourth amendment of the United States Constitution as stated in *Schneckloth*. In this case, since the state relied upon consent for the entry, it had the burden of proving that the consent was freely and voluntarily given."). The *Rodgers* court could have chosen to continue with the *Gautreaux* language, but it did not. Despite strong advocacy in a dissent arguing in favor of remaining with the *Gautreaux* verbage, the *Rodgers* court nonetheless chose the language and the test of *Schneckloth*. *Id.* at 115-16.

¶100 One might think that our clarification in *Rodgers* and our more recent precedent would cause the court to pause when using subsequently exacted language of *Gautreaux*. In our more recent cases analyzing the consent exception to the warrant requirement, we have not used the "unequivocal and specific" language. Notably, the court does not now overrule *Rodgers*, the test as stated in *State v. Wantland* and *State v. Brar*, or any host of other cases, wherein, consistent with *Schneckloth*, we again confirmed that consent to a search has two requirements. "First, the consent must [be] 'freely and voluntarily given.' Second, the consent must be given by an individual having either actual or apparent authority over the place to be searched." *Wantland*, 355 Wis. 2d 135, ¶23 (citation omitted); see *Brar*, 376

3

Wis. 2d 685, ¶26.  Presumably then, the court today means no change be made to that test, unlike Rodgers wherein the court specifically "explained" the language of Gautreaux.

¶101 Other recent cases have similarly eschewed the "unequivocal and specific" language. They remain precedent. See, e.g., State v. Artic, 2010 WI 83, ¶32, 327 Wis. 2d 392, 786 N.W.2d 430 ("The State bears the burden of proving that consent was given freely and voluntarily."); State v. Blackman, 2017 WI 77, ¶4, 377 Wis. 2d 339, 898 N.W.2d 774 ("When the legality of a warrantless search is based on the consent of the defendant, that consent must be freely and voluntarily given.").

¶102 Our court has the ability to engage in new federalism if it so chooses. See Diane Sykes, "Reflections on the Wisconsin Supreme Court," Marquette Lawyer, Summer/Fall 2006, at 52-63, https://law.marquette.edu/assets/marquette-lawyers/pdf/marquette-lawyer/2006-summer/Summer06pp52-63.pdf. If the majority now wished to invoke additional constitutional protections under our State constitution, as advocated by the majority opinion writer's then-dissent in Rodgers, it would plainly do so. See Rodgers, 119 Wis. 2d at 125 (Abrahamson, J., dissenting) ("Although the majority concludes that Article I, section 11, is substantially the same as the fourth amendment, it errs in analyzing the consent issue under the state constitution by guessing what the United States Supreme Court might hold under the fourth amendment."); id. at 128 (Abrahamson, J., dissenting) ("In light of the frequent use of consent to justify noncompliance with the warrant requirement,

4

diluting the meaning of consent dilutes the impact of the state constitutional guarantee of the sanctity of the home. This court should avoid facilitating the erosion of the state constitutional guarantee of privacy. The solution to the problem presented by this case is not to reduce the requirements for consent but to prevent the problem from arising by encouraging officers to obtain warrants."). Since the court has neither disavowed the Schneckloth test nor has it overruled our precedent, it ought not provoke confusion by using language that could be interpreted to the contrary.

¶103 And so I write to question why, despite the court's clarification in Rodgers and our adoption of the Schneckloth test, the majority opinion nonetheless chooses the language from Gautreaux. In addition, instead of turning to our own precedent, United States Supreme Court precedent, or even precedent from the Seventh Circuit, our court now reaches for distinguishable cases from the Sixth and Ninth Circuits in support of the terms "unequivocal and specific." See Andrews v. Hickman Cty., 700 F.3d 845, 854 (6th Cir. 2012) (holding that officer's alleged warrantless entry into parents' home after being told to wait outside cannot be justified on the basis of consent); United States v. Chan-Jimenez, 125 F.3d 1324 (9th Cir. 1997) (concluding that defendant's failure to respond verbally to officer's request to search his truck supports the argument that defendant did not voluntarily consent the search). If the majority intended to adopt a specificity requirement in addition to the established Schneckloth test, it should so indicate. It

5

does not. Courts, like ours, which use "unequivocal and specific" leave to the imagination what, if anything, that phrase might mean. In fact, the courts that have used this language nonetheless continue to analyze the issue in terms of whether consent was freely and voluntarily given by one with the authority to do so.

¶104 Courts which have used "unequivocal and specific," nonetheless leave that phrase undefined and unexamined. The legal analysis and conclusions employed do not analyze the "unequivocal and specific" requirement but instead continue to rest on whether consent was given in terms of being free and voluntary. See, e.g., United States v. Salas, 756 F.3d 1196, 1203 (10th Cir. 2014) (reciting language from a prior case requiring consent to be "unequivocal and specific," yet deciding that consent was voluntarily given without subsequently using the words "unequivocal" or "specific"); Andrews, 700 F.3d at 854 (stating that consent must be "voluntary, unequivocal, specific," and then concluding that there was actually no consent at all). I am unaware of any case wherein the Schneckloth test is met, but consent was nonetheless deemed insufficient because it was too equivocal or lacked sufficient specificity. Thus, even when the suspect phrase has been used, the analysis of Schneckloth seems to be the test. We should strive to clarify legal standards, rather than sow seeds of confusion.

¶105 To be sure, Article 1, Section 11 of the Wisconsin Constitution is substantively identical to the Fourth Amendment

6

to the United States Constitution, which requires in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."[1] U.S. Const. amend. IV; see also Wis. Const. art. I, § 11. A search conducted without a warrant issued upon probable cause is per se unreasonable, subject to only a few specifically established and well-delineated exceptions. Schneckloth, 412 U.S. at 219; State v. Krajewski, 2002 WI 97, ¶24, 255 Wis. 2d 98, 648 N.W.2d 385. One such exception is consent——a warrantless search does not violate the Fourth Amendment to the United States Constitution, nor Article 1, Section 11 of the Wisconsin Constitution, if the search is conducted with consent. Schneckloth, 412 U.S. at 219; Krajewski, 255 Wis. 2d 98, ¶24.

¶106 The United States Supreme Court has repeatedly held that consent must be "freely and voluntarily given" by someone with authority in order to satisfy the Fourth Amendment's reasonableness requirement. See, e.g., Schneckloth, 412 U.S. at 222, 248 ("We hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments

---

[1] Neither the Wisconsin Constitution nor the United States Constitution require, by their terms, unequivocal and specific consent. We interpret Article 1, Section 11 of the Wisconsin Constitution coextensively with the United States Supreme Court's interpretation of the Fourth Amendment. State v. Floyd, 2017 WI 78, ¶19, 377 Wis. 2d 394, 898 N.W.2d 560; State v. Dumstrey, 2016 WI 3, ¶14, 366 Wis. 2d 64, 873 N.W.2d 502. Thus, we follow Schneckloth v. Bustamonte, 412 U.S. 218 (1973), in our interpretation of consent to search.

require that it demonstrate that the consent was in fact voluntarily given."); <u>Florida v. Royer</u>, 460 U.S. 491, 497 (1983) ("[It is not] disputed that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given."). However, as stated in our plurality opinion in <u>Brar</u> this, along with the individual having actual or apparent authority over the place to be searched, is the extent of the constitutional requirement for consent. See <u>Brar</u>, 376 Wis. 2d 685, ¶¶26-27 ("Contrary to Supreme Court precedent, decisions from the court of appeals have required the State to prove consent was given knowingly and intelligently. The Supreme Court in <u>Schneckloth</u> rejected precisely this requirement. As we interpret our constitution consistent with the Fourth Amendment, we withdraw any language from these cases that requires that consent to a search be given knowingly or intelligently." (citations omitted)); <u>see also</u> <u>Schneckloth</u>, 412 U.S. at 235 ("Our cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection."). The Supreme Court has never held that consent must be "unequivocal and specific."

¶107 Further, any requirement that consent to search be "unequivocal and specific" appears to be at odds with other United States Supreme Court precedent. In <u>Florida v. Jimeno</u>, 500 U.S. 248 (1991), a suspect gave the police officer consent to search his car. <u>Id.</u> at 249-50. Without receiving consent to

8

do so, the officer opened a container inside the car and found a kilogram of cocaine inside it. Id. at 250. The defendant challenged the search arguing that he did not "specifically" give the officer permission to search the container. The Court held that this search did not violate the Fourth Amendment concluding that the test for consent is an objective one: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id. at 251-52; id. at 252 ("Respondents argue . . . that if the police wish to search closed containers within a car they must separately request permission to search each container. But we see no basis for adding this sort of superstructure to the Fourth Amendment's basic test of objective reasonableness."). In Jimeno the Court concluded that it was objectively reasonable for an officer to expect that general consent to search the car included consent to search a container inside the car, even though it was argued that such consent to search the container was not specifically given. Id. at 251.

¶108 Following the United States Supreme Court's lead, many jurisdictions, including the Seventh Circuit, have concluded that consent be as required in Schneckloth. See, e.g., United States v. Sabo, 724 F.3d 891, 893-94 (7th Cir. 2013) (concluding that consent to search is implied where officer requested to enter residence and defendant stepped back and to side to allow entry; further, that "[c]onsent can come in many forms, but it must always be given voluntarily"); United States v. Jones, 701 F.3d 1300, 1317, 1320-21 (10th Cir. 2012) (stating that

9

"'[v]oluntary consent' consists of two parts: (1) the law enforcement officers must receive either express or implied consent, and (2) that consent must be freely and voluntarily given" and then concluding that defendant can be deemed to have impliedly consented to officers' entry into his residence if defendant said or did something which permitted the officers to form a reasonable belief they were authorized to enter residence); see also United States v. Reynolds, 646 F.3d 63, 73 (1st Cir. 2011) (holding that consent to search headboard is implied when defendant gestured to headboard while answering "yes" to officer's question of whether defendant had weapons, because gesture demonstrated defendant understood officer intended not only to learn of existence of weapons but also to find them); United States v. Stabile, 633 F.3d 219, 231, 233 (3d Cir. 2011) (following Schneckloth and requiring only that consent to a search be voluntarily given by a person having authority to give it); United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998) ("[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual.").

¶109 When considered in the broader context of the United States Supreme Court's jurisprudence surrounding consent searches, it makes sense that courts consider the circumstances which concern whether consent was freely and voluntarily given. "As with other factual determinations bearing upon search and seizure, determination of consent to enter must be 'judged against an objective reasonable person standard.'" Illinois v.

10

Rodriguez, 497 U.S. 177, 188 (1990); Jimeno, 500 U.S. at 251. The United States Supreme Court has long recognized that this objective standard protects citizens from police overreach, as "[a]nything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." Terry v. Ohio, 392 U.S. 1, 22 (1968). Because we interpret our constitution's provisions governing searches and seizures coextensively with the United States Supreme Court's interpretation of the Fourth Amendment, Floyd, 377 Wis. 2d 394, ¶19, I would not fuel confusion by using this additional, undefined, unanalyzed phrase.

¶110 As a result, I respectfully concur.

¶111 PATIENCE DRAKE ROGGENSACK, C.J. *(dissenting).* The circuit court found as an historic fact that Kirk Sullivan consented to Officer Steven Keller's entry into the apartment he shared with Faith Reed. This finding is not clearly erroneous. Furthermore, under the totality of circumstances, Sullivan's consent was voluntarily given and was not unequivocally withdrawn. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.

## I. BACKGROUND

¶112 Officer Steven Keller of the Tomah Police Department responded to a call that two men were causing a disturbance. When he arrived, the altercation had stopped. He met two men, neither of whom was involved in the altercation. One of the men was Kirk Sullivan who said that the disturbance involved two brothers. Sullivan said that he thought that one of the brothers, Jerome Harris, was in Sullivan's apartment watching a football game.

¶113 Officer Keller, in a very conversational tone according to the record produced by the audio-video camera he was wearing, asked Sullivan if they could go to his apartment to talk with Harris. Sullivan did not verbally respond, but began walking toward an apartment building. Keller did not know in which apartment Sullivan lived; therefore, in response to Keller's request, Sullivan led the way to his apartment.

¶114 Sullivan opened the ground floor door of a nearby apartment building, and Keller followed him into the building. Sullivan led the way up the stairs to the second floor. Keller

1

followed. Sullivan opened the door into the second floor hallway, held the door open for Keller, and Keller followed Sullivan into the second floor hallway. Sullivan led Keller to apartment 206 where he lived with Reed.

¶115 Sullivan knocked on his apartment door and then immediately opened it. Sullivan stepped inside and partially closed the door behind him. Keller then pushed the partially open door, saw Reed and Jerome Harris, and entered the apartment. Keller saw Sullivan sticking something into his pocket. He told Sullivan to put the object he had stuck in his pocket on the counter.

¶116 The object was marijuana. More marijuana was found, and Reed, who was also in the apartment, and Harris were arrested. Reed moved to suppress the marijuana based on the allegation that Keller did not have consent to enter the apartment that she shared with Sullivan.

¶117 The circuit court found that by his conduct of "leading the way to the apartment" Sullivan freely and voluntarily consented to Keller's entry into his apartment and that his partial closing of the apartment door was not an unequivocal withdrawal of consent. Accordingly, the circuit court denied Reed's motion to suppress. The court of appeals affirmed.

## II. DISCUSSION

### A. Standard of Review

¶118 Determining whether consent was given involves a question of constitutional fact to which we apply a two-step

2

analysis. State v. Post, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634. First, we examine whether consent was given as a question of historic fact based on what was said and what actions and gestures occurred. State v. Brar, 2017 WI 73, ¶13, 376 Wis. 2d 685, 898 N.W.2d 499. We uphold a circuit court's finding of historic fact unless it is clearly erroneous. Id. Stated otherwise, "[w]e uphold a finding of consent in fact if it is not contrary to the great weight and clear preponderance of the evidence." State v. Artic, 2010 WI 83, ¶30, 327 Wis. 2d 392, 786 N.W.2d 430. Second, we apply the facts found to constitutional principles to determine whether consent was voluntarily given. Schneckloth v. Bustamonte, 412 U.S. 218, 222-23 (1973).

### B. Consent

¶119 The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect against unreasonable searches and seizures. Ordinarily, they are construed coextensively when we consider the question of consent. State v. Johnson, 2007 WI 32, ¶20, 299 Wis. 2d 675, 729 N.W.2d 182. Although warrantless searches are presumed to be unconstitutional, consent to search is an exception to the warrant requirement. Schneckloth, 412 U.S. at 219; State v. Phillips, 218 Wis. 2d 180, 196, 577 N.W.2d 794 (1998).

¶120 The majority opinion inserts a new test for consent saying that consent must be "specific."[1] Asserting that consent

---

[1] Majority op., ¶¶8, 58, 60.

3

must be "specific" is not required by a United States Supreme Court opinion, but rather, it is cobbled together from cases where defendants were either under arrest or compelled to consent by some means. The audio-video recording does not support a conclusion that Sullivan was arrested or compelled to take Keller to his apartment to speak with Harris. Sullivan was never commanded or ordered to do so. Here, the majority uses the requirement that consent be "specific" to overturn the historic fact of consent by conduct that the circuit court found, saying that Keller never asked to enter Reed's apartment.[2] Separation of the historic facts from whether consent was voluntarily given assists in applying the correct standard to questions of constitutional fact. The majority opinion conflates the two standards.

## 1. Circuit court finding

¶121 As I review the circuit court's decision, the first consideration is whether consent was given, as an historic fact. Consent may be given orally or through gestures or conduct. Brar, 376 Wis. 2d 685, ¶17. As we have explained, consent need not be granted explicitly but may be granted by implication after considering the totality of circumstances. Id. The context in which consent is said to have been given is an important part of our assessment of a circuit court's finding of consent in fact. Id., ¶22.

---

[2] Majority op., ¶9.

4

¶122 Here, the circuit court found that Sullivan consented to Keller's entry into his apartment. The court based this finding on Sullivan's statement that Harris, the man to whom Officer Keller wanted to speak "was probably in the apartment that Mr. Sullivan described as my apartment," combined with Sullivan and Keller walking to Sullivan's apartment when "Sullivan was in the lead."

¶123 As I examine the circuit court's findings of historic fact, they are not clearly erroneous. The audio-visual recording from the body camera that Officer Keller wore shows he asked Sullivan if they could go and talk with Harris. Sullivan had said that Harris was in his apartment watching a football game. Although Sullivan did not verbally respond to Keller's request, he began leading the way to his apartment. The audio-visual recording clearly shows Sullivan leading the way. That he did so is logical because Keller did not know where Sullivan lived.

¶124 As they approached apartment 206, Officer Keller can be heard telling dispatch that he will be in apartment 206. Sullivan then knocked on the door of his own apartment. It appears Sullivan did so because he was bringing Keller into the apartment, otherwise there would have been no reason for Sullivan to knock on the door of his own apartment before entering. Therefore, in this context, where Keller wanted to talk to Harris combined with Sullivan's statement that Harris was in his apartment and Sullivan's knock on the door before entry, the circuit court's finding that Sullivan consented to

Keller's entry into his apartment is not against the great weight and clear preponderance of the evidence presented to the circuit court.

### 2. Voluntariness

¶125 When consent as a matter of historic fact has been found, we then consider whether consent was given freely and voluntarily. The State bears the burden of proving by clear and convincing evidence that consent was given freely and voluntarily. Schneckloth, 412 U.S. at 222; Phillips, 218 Wis. 2d at 197. To make this determination, we again consider the totality of circumstances surrounding the alleged consent. Artic, 327 Wis. 2d 392, ¶33. The circumstances are examined using multiple non-exclusive factors such as:

> (1) whether the police used deception, trickery, or misrepresentation in their dialogue with the defendant to persuade him to consent; (2) whether the police threatened or physically intimidated the defendant or "punished" him by the deprivation of something like food or sleep; (3) whether the conditions attending the request to search were congenial, non-threatening, and cooperative, or the opposite; (4) how the defendant responded to the request to search; (5) what characteristics the defendant had as to age, intelligence, education, physical and emotional condition, and prior experience with the police; and (6) whether the police informed the defendant that he could refuse consent.

Id.

¶126 In regard to whether Sullivan's consent was voluntarily given, I agree with the circuit court's conclusion. Keller did not order or command Sullivan to take him to his apartment so he could talk with Harris. Rather, he asked Sullivan if they could go to his apartment to talk to Harris.

6

The tone of Keller's voice on the audio-video recording is very conversational. He never ordered or commanded Sullivan to take him to his apartment. No tricks, threats or punishments were used to obtain Sullivan's consent to enter his apartment.

### 3. Withdrawal of consent

¶127 Consent lawfully given may be withdrawn. United States v. Sanders, 424 F.3d 768, 774 (8th Cir. 2005). Withdrawal of consent must be made by an unequivocal act or statement. State v. Wantland, 2014 WI 58, ¶33, 355 Wis. 2d 135, 848 N.W.2d 810.

¶128 Accordingly, I must determine whether Sullivan's partially closing the door to his apartment after he knocked to announce their entry and did not ask Officer Keller to remain in the hallway unequivocally constituted withdrawal of Sullivan's consent to Keller to enter his apartment. I conclude that under the totality of circumstances Sullivan's consent was not unequivocally withdrawn.

¶129 First, Sullivan knocked on the door to announce their entry. Second, he said nothing to Keller about waiting in the hall, and third, he did not close the door completely, but left it partially open.

¶130 Sullivan brought Keller to his apartment to talk with Harris. If Sullivan wanted Keller to wait in the hall, he could have said, "wait here" or he could have closed the door completely. He did neither. Therefore, it was reasonable for Keller to push on the door and follow Sullivan into his apartment to talk to Harris, as that was the reason for which

7

Sullivan brought Keller to the apartment he shared with Reed. Sullivan did not unequivocally withdraw consent to come into his apartment to talk with Harris.

¶131 The majority opinion asserts that Sullivan "attempted to shut the door behind him to prohibit the officer from entering the apartment."[3] That asserted reason is pure fiction. The record contains no statement about why Sullivan partially closed the door. Sullivan did not testify nor did he state on the audio-visual recording why he partially closed the door. We do not know why he did it.

¶132 One could easily postulate that Sullivan partially closed the door because as he entered his apartment, he saw marijuana lying on the counter and he wanted to give himself a moment to stuff it into his pocket before Keller entered the apartment. Certainly, that hypothesis fits the audio-visual recording that shows Sullivan stuffing something into his pocket as he entered the apartment. The audio-visual recording was presented to the circuit court, and the "something" Sullivan stuffed into his pocket was marijuana.

¶133 I agree with the circuit court. Sullivan's partial closing of the apartment door was not an unequivocal withdrawal of his consent for Keller to enter.

---

[3] Majority op., ¶¶10, 60.

### III. CONCLUSION

¶134 The circuit court found as an historic fact that Sullivan consented to Keller's entry into the apartment he shared with Reed. This finding is not clearly erroneous. Furthermore, under the totality of circumstances, Sullivan's consent was voluntarily given and was not unequivocally withdrawn. Accordingly, I would affirm the court of appeals, and I respectfully dissent from the majority opinion.