COURT OF APPEALS
DECISION
DATED AND FILED

February 24, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP826-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2022CF1157

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CRIS MICHAEL MONGE-DAVILA,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Brown County: MARC A. HAMMER, Judge. *Reversed and cause remanded with directions.*

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Cris Monge-Davila appeals from a judgment, entered upon his no-contest plea, to a drug-related charge. On appeal,

Monge-Davila argues that the circuit court erred by denying his motion to suppress evidence obtained following a search of his home pursuant to his consent. He contends that the court's finding that he in fact provided consent is clearly erroneous and, in the alternative, that his consent was involuntary. For the following reasons, we conclude, under the totality of the circumstances, that any consent Monge-Davila provided was involuntary, and we reverse the judgment of conviction with directions that the circuit court grant Monge-Davila's motion to suppress and allow him to withdraw his plea.

## BACKGROUND

¶2 The State charged Monge-Davila with possession with intent to deliver more than 200 grams but not more than 1,000 grams of tetrahydrocannabinols, possession of an illegally obtained prescription drug, and possession of drug paraphernalia. According to the criminal complaint, members of the Brown County Drug Task Force executed a search warrant at an apartment across the hall from Monge-Davila's apartment. During the execution of the search warrant, Monge-Davila exited his apartment, and officers immediately smelled the odor of marijuana coming from inside. The State alleged that law enforcement searched Monge-Davila's apartment pursuant to his consent and, during that search, located the evidence underlying his charges.

¶3 Monge-Davila filed a motion to suppress the evidence located in his apartment. He argued that he neither explicitly nor implicitly consented to law enforcement's search of his apartment. To the extent the circuit court found that Monge-Davila gave consent, he argued that his consent was involuntary.

¶4 At a suppression hearing, Narcotic Investigator (NI) Garth Russell of the Brown County Drug Task Force testified that he and other members of the task

force, including NI Ben Harvath, executed a search warrant at an apartment complex on the morning of July 7, 2022. The search warrant was for an apartment across the hall from Monge-Davila's apartment. Harvath was wearing a body-worn camera during the execution of the search warrant that recorded law enforcement's interaction with Monge-Davila, and the entire recording was admitted into evidence.

¶5 On appeal, both parties stress the importance of the recording to the issues raised, and we therefore provide a detailed summary of its contents.[1] While the search warrant was being executed, Monge-Davila exited his apartment. Russell, Harvath, and a third officer were standing outside of Monge-Davila's apartment when Monge-Davila exited his apartment.[2] Russell informed Monge-Davila that Monge-Davila could "close the door" if he wanted and gestured for him to enter the hallway. Several other officers were moving through the hallway toward the rear exit of the apartment building. Russell was wearing "plain clothes," and the remaining officers were wearing "tactical vest[s]" with holstered firearms.

¶6 Upon entering the hallway, Monge-Davila closed his apartment door behind him. Immediately after Monge-Davila closed the door, an unnamed officer twice asked Monge-Davila whether he had "any drugs" in his apartment.

---

[1] With one exception that we discuss below, the contents of the audiovisual recording from Harvath's body-worn camera, including what was said, do not appear to be in dispute.

[2] At the suppression hearing, Russell conceded that at the time Monge-Davila exited his apartment, Russell was standing between Monge-Davila and the rear exit of the apartment building, and Harvath was standing between Monge-Davila and the front exit of the apartment building. Russell's and Harvath's physical positions in the hallway did not change until Monge-Davila allegedly provided his consent for the officers to search his apartment.

Monge-Davila stated, "No." At this time, there were over seven officers in the hallway. Harvath then commented that Monge-Davila was "shaking pretty good," and he requested Monge-Davila's name. Russell then asked, "Why are you shaking so much?" Monge-Davila responded by stating, "Because this is a lot of people. I just woke up and I don't know what the fuck is going on." Monge-Davila locked his apartment door during this period.

¶7     Harvath and Russell then frisked Monge-Davila, and Harvath stated, "You're just acting real nervous and shaky." Afterward, Monge-Davila commented, while gesturing to the officers in the hallway, "Well, I just woke up and left my house and look." Russell asked, "Is there some fucking weed coming out of your apartment? I thought I smelled something." Monge-Davila responded, "No. I don't smoke."

¶8     Harvath asked Monge-Davila where he was going, to which Monge-Davila responded that he was going to work on his vehicle. At this time, the third officer left the hallway area. Monge-Davila then attempted to walk in front of Harvath to leave the apartment building. Russell grabbed Monge-Davila by the arm and stated, "Hold on boss, you are not free to leave. You are being detained, you are not free to leave."

¶9     Monge-Davila then attempted to make a phone call using his cell phone, but Russell immediately seized the device, saying, "No, no, no." Monge-Davila then stated that he wanted to call his girlfriend because he did not "know what's going on here—What the fuck?" Harvath asked Monge-Davila why he needed to call his girlfriend if he just woke up, to which Monge-Davila responded, "Because I just woke up." Harvath then asked, "Do you usually wake up super shaky, nervous, and you gotta call your girlfriend?" Monge-Davila then

said that he "goes to the doctor" for his nervousness and that he was "scared." Around this time, a different officer appeared from the searched apartment and stood in the hallway behind Russell.

¶10 Russell asked, "Is there anything inside your apartment? If you have a little bit of weed, I don't give a shit about—is there anything else that police should know about that's inside?" Monge-Davila responded, "No." Russell then asked, "What if we wanted to take a look around? If you got a little bit of weed, we wouldn't give a shit about that." Monge-Davila then shook his head side to side and said, "No, like, really, really, no."

¶11 Russell again asked Monge-Davila if there was any marijuana in his apartment and stated:

> Again, dude, if it's a little bit of marijuana, don't nobody gives a shit about that. But if you're lying to us and we go the extra mile and we find a bunch of shit in there, or even if it's a little bit of shit and we end up going the extra mile, then our discretion kind of goes out the window for lying you know what I mean? So why don't you give me and my partner here a chance to look around? Like I said, if it's just a little bit of weed, we're good, right?

¶12 Monge-Davila responded, "Where's the card or something because I don't know what's going on. I'm scared." Russell then pulled out his badge, held it toward Monge-Davila, and proclaimed, "Oh, my credentials? Boom! Right there." Harvath explained, "We're police officers." Monge-Davila responded, "I know you all are police officers, but I don't know what's going on." Russell answered that "we served a warrant and you came here acting super nervous." Monge-Davila interrupted, stating, "No … because I woke up … go out my door and see like 100 police, you know, and anybody would get scared. You know, I'm not scared about nothing." Russell again stated that he would not "give a crap" if

Monge-Davila had a small amount of marijuana in the apartment so long as Monge-Davila did not make him "go the extra mile."

¶13 Harvath then asked Monge-Davila for his personal information and typed it into an application on his cell phone. Russell testified that he observed from the lock screen of Monge-Davila's cell phone, which Russell was still holding, that the subject of the investigation at the apartment across the hall from Monge-Davila was calling Monge-Davila. Russell then held the cell phone up to Monge-Davila. Monge-Davila informed the officers that he knew the person whose apartment was being searched.

¶14 Finally, Russell asked, "So, you gonna let us look around inside or no? What are you thinking?" What Monge-Davila stated in response is disputed; however, it resulted in several officers entering the apartment to search.

¶15 Russell testified that he asked Monge-Davila "something along the lines of are we able to go inside or look around," and Monge-Davila said, "[Y]ou can." Russell stated that he repeated back to Monge-Davila, "[W]e can?," and Monge-Davila said, "I don't think anything is in there or something along the lines of that." On cross-examination, Russell testified that "[a]n audio recorder can pick up only so much. What I heard and what Harvath heard was, '[Y]ou can.' I heard it plain as day standing there …." Russell clarified that he was basing his testimony both on what he heard at the time and what he heard after reviewing the recording at his office using headphones. Harvath similarly testified that he heard,

both at the time of the incident and after reviewing the recording, Monge-Davila state, "[Y]ou can."[3]

¶16 The circuit court denied Monge-Davila's motion to suppress in an oral ruling, stating, "To be frank, … a lot of this turns on the video." The court first determined that Monge-Davila in fact consented to the search, finding that Monge-Davila responded to the final request to search by stating, "I don't have nothing, but okay." Next, applying the nonexclusive factors for determining the voluntariness of consent, *see* ***State v. Phillips***, 218 Wis. 2d 180, 198-203, 577 N.W.2d 794 (1998), the circuit court further determined that Monge-Davila's consent was voluntarily given. Although a "close case," the circuit court found that Monge-Davila "weighed his options and wanted to minimize the possibility of additional problems … and took the calculated risk in allowing them in." Specifically, the court found that Monge-Davila "was persuaded that if they got a warrant and found a little bit of marijuana, things would be more difficult for him." Moreover, the court stated that it did not "see the type of pressures I think I have to see to conclude that the pressure was a contributing factor." A detailed synopsis of the court's findings and decision surrounding voluntariness will be provided below.

¶17 Monge-Davila now appeals.

---

[3] Monge-Davila acknowledged before the circuit court that what he said immediately prior to the officers searching his apartment "was the subject of much debate." He argued that he could not be heard on the recording saying, "you can," and that "[d]uring that portion of the video there is a lot of background noise. However, all other dialogue before and after the supposed 'you can' can be heard quite clearly …." Therefore, Monge-Davila asked the court to find Russell and Harvath "not credible as to this issue."

**DISCUSSION**

¶18     On appeal, Monge-Davila renews his argument that any consent he provided for law enforcement to search his apartment was involuntary.[4]  The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV; *State v. VanBeek*, 2021 WI 51, ¶23, 397 Wis. 2d 311, 960 N.W.2d 32 ("The Wisconsin Constitution contains nearly identical protections, WIS. CONST. art. I, § 11, which we have interpreted consistent with its federal counterpart.").  A warrantless search is presumptively unreasonable and is constitutional only if it falls under an exception to the warrant requirement.  *State v. Tullberg*, 2014 WI 134, ¶30, 359 Wis. 2d 421, 857 N.W.2d 120.

¶19     "One well-established exception to the warrant requirement is a search conducted pursuant to consent."  *State v. Artic*, 2010 WI 83, ¶29, 327 Wis. 2d 392, 786 N.W.2d 430.  "Consent to search must be unequivocal and specific, and it must be freely and voluntarily given.  Consent is not freely and voluntarily given if it is the result of mere 'acquiescence to a claim of lawful authority.'"  *State v. Reed*, 2018 WI 109, ¶8, 384 Wis. 2d 469, 920 N.W.2d 56 (footnotes omitted; citation omitted).  The State bears the burden of proving the

---

[4] Monge-Davila also argues that the circuit court's finding that he consented to law enforcement's request to search his apartment is clearly erroneous.  We need not reach this issue because we conclude that any consent that he in fact gave was involuntary.  *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (stating that we need not address alternative arguments when one is dispositive).  We note, however, that it is not clearly discernible from the recording what Monge-Davila said immediately prior to the officers searching his apartment.  Additionally, the court did not expressly or implicitly credit the officers' testimony that Monge-Davila said, "[Y]ou can," as the court found that Monge-Davila actually said, "I don't have nothing, but okay."

voluntariness of consent by clear and convincing evidence. *Artic*, 327 Wis. 2d 392, ¶32.

¶20    "The determination of 'voluntariness' is a mixed question of fact and law based upon an evaluation of 'the totality of all the surrounding circumstances.'" *Id.* (citation omitted).  We review the circuit court's findings of historical fact to determine if they are clearly erroneous; however, we "independently apply the constitutional principles to the facts as found to determine whether the standard of voluntariness has been met." *Phillips*, 218 Wis. 2d at 195.  The clearly erroneous standard of review also applies when the record consists of disputed testimony and a video recording. *State v. Walli*, 2011 WI App 86, ¶17, 334 Wis. 2d 402, 799 N.W.2d 898.

¶21    In *Phillips*, our state supreme court outlined multiple nonexclusive factors to determine whether an individual's consent was voluntary. *Phillips*, 218 Wis. 2d at 198-203; *Artic*, 327 Wis. 2d 392, ¶33.  We address each of these factors below.

## I. Threats, physical intimidation, deception, trickery, or misrepresentation and Monge-Davila's personal characteristics

¶22    We begin with an analysis of the first, second, and fifth *Phillips* factors, which we conclude weigh in favor, though not strongly, of a determination that Monge-Davila's consent was voluntary.  With respect to the first and second *Phillips* factors, the circuit court determined that the officers did not threaten Monge-Davila or use deception, trickery, or misrepresentation in their dialogue to persuade him to consent.  On appeal, Monge-Davila concedes that the officers did not threaten him or engage in deception, trickery, or misrepresentation because the

officers identified themselves and, eventually, stated that they wanted to search his apartment based on the smell of marijuana. *See Artic*, 327 Wis. 2d 392, ¶¶35-37.

¶23  We pause to note that the *Artic* court explained that the first two *Phillips* factors may be implicated when law enforcement officers inform a defendant that they will get a warrant if the defendant does not give consent. *See Artic*, 327 Wis. 2d 392, ¶38. However, "[t]hreatening to obtain a search warrant does not vitiate consent if 'the expressed intention to obtain a warrant is genuine … and not merely a pretext to induce submission.'" *Id.*, ¶41 (citation omitted).

¶24  Here, the circuit court found that during the second request to search, Russell informed Monge-Davila that law enforcement would get a warrant if he did not consent to their search. The circuit court stated that it did not know whether the officers "would have gotten the warrant …. I think a lot of that depends upon some variables that I'm unaware of but I can't conclude that it was misrepresented …."

¶25  No testimony was taken at the suppression hearing to address this issue, and the recording does not evidence an attempt by any officer to obtain a warrant. According to the State, we can overlook this factual omission in its favor because "under the circumstances, there [is] good reason to believe that police would have obtained a warrant given that they plainly had probable cause to believe Monge-Davila's home contained marijuana after detecting its strong odor and were already on scene to execute another search warrant in the same building." Monge-Davila does not respond to this argument, and we deem it conceded. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578.

¶26     The fifth *Phillips* factor "looks at the defendant's characteristics, including youth, lack of education, lack of intelligence, physical and emotional condition, and experience with the police." *Artic*, 327 Wis. 2d 392, ¶59.   In addressing this factor, we consider "whether there was evidence 'suggesting that the defendant was *particularly susceptible* to improper influence, duress, intimidation, or trickery.'" *Id.* (citation omitted).   Here, the circuit court noted Monge-Davila's relatively young age (19) at the time of the interaction, that he was at least of average intelligence, and that there was nothing in the record to suggest that he lacked communication skills or had prior experience with law enforcement.   The court acknowledged that Monge-Davila was present at the suppression hearing with an interpreter, but the court stated it was "difficult … to reach the conclusion that he didn't understand" the requests for consent.   The court also recognized that Monge-Davila stated during the interaction that he took medication for his nervousness, but the court emphasized that it was not sure if that was "relevant."

¶27     Given the circuit court's supported findings regarding Monge-Davila's characteristics—particularly, that he could communicate in English—we need not address this issue further, other than to note that it weighs in favor of voluntariness.   *See Phillips*, 218 Wis. 2d at 202 (noting that the defendant "could speak and understand the English language").[5]

---

[5] It is worth noting that the record is devoid of any suggestion that Monge-Davila had prior contact with law enforcement.

11

**II. The remaining *Phillips* factors**

¶28 We now turn to the remaining ***Phillips*** factors and other circumstances, which we conclude are the most pertinent to the issue of voluntariness under the facts of this case and weigh heavily against a determination that there is clear and convincing evidence that Monge-Davila's consent was voluntary. Under the third ***Phillips*** factor, we consider the conditions attending the requests for consent to search, and we ask "whether the officers and the defendant 'were open and forthright during the encounter, each posing questions and providing information.'" ***Artic***, 327 Wis. 2d 392, ¶43 (citation omitted). We also examine whether "the police [made] a show of force at the time the consent [was] sought, or if the surroundings [were] coercive in other respects." ***Id.*** (alterations in original; citation omitted).

¶29 The circuit court found that the conditions attending the request were not "unique." While the State concedes that "exiting one's apartment to find a dozen uniformed police officers executing a search warrant in a neighboring apartment unit could be a surprising experience," it "invites this [c]ourt to review the [recording] to see how undramatic the four and one-half minute encounter truly was." In support of its analysis, the State cites Monge-Davila's decision to open his door to exit his apartment and states that, "within seconds of [Monge-Davila] stepping out into the hallway, most of the officers can be seen leaving" the hallway.[6]

---

[6] The State suggests that Monge-Davila elected to step into the hallway even after seeing the officers. The circuit court did not make a finding on this issue. Based on the recording, however, we are not convinced by the State's contention that Monge-Davila would have otherwise entered the hallway upon observing the officers even if Russell had not gestured for him to do so. Regardless, it is undisputed that Monge-Davila attempted to leave the hallway and terminate his interaction with law enforcement, and the officers prevented him from leaving.

¶30 The circuit court's conclusion, and the State's assertions, that the third *Phillips* factor does not weigh in favor of involuntariness, are in conflict with the undisputed facts surrounding the interaction. Based on the suppression hearing testimony, the recording, and case law, we view the interaction as being rather disagreeable and coercive.

¶31 Upon exiting his apartment, Monge-Davila was confronted by several armed officers wearing tactical vests, one of whom immediately began asking if he had drugs in his apartment. *See United States v. Robertson*, 736 F.3d 677, 680-81 (4th Cir. 2013) (holding that consent was not voluntary because the area "was dominated by" armed police officers, an "officer's questioning was immediately accusatory," and the defendant "watched as every individual in a bus shelter next to him was handled by the police"). As depicted in the recording, several of the officers stopped to look inside his apartment before Monge-Davila closed and locked his apartment door. Once he entered the hallway, Monge-Davila was physically cornered by at least two officers at all times prior to his consent to search. Not long into the interaction, the officers frisked Monge-Davila. *See Terry v. Ohio*, 392 U.S. 1, 24-25 (1968) (stating that a frisk is a "severe, though brief, intrusion upon cherished personal security" and can be an "annoying, frightening, and perhaps humiliating experience"); *United States v. Beauchamp*, 659 F.3d 560, 572 (6th Cir. 2011) (holding that consent was not voluntary because there were two uniformed officers at the scene, one of whom "had placed his hands on [the defendant's] body to conduct the frisk").

¶32 Significant to our analysis, shortly after the interaction began, Russell grabbed Monge-Davila by the arm and prevented him from leaving. As the State concedes, Monge-Davila was seized for purposes of the Fourth Amendment when Russell physically prevented him from leaving. *See Reed*, 384

Wis. 2d 469, ¶62 (stating it was "noteworthy" to the court's conclusion that consent was not in fact provided "that at the very beginning of the interaction," the individual was prevented from leaving); *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973) ("The fact that [the defendant] was under arrest is indeed a factor militating against a finding of consent because after arrest a subject is more susceptible to possible duress or coercion."). Even more, Russell seized Monge-Davila's cell phone from Monge-Davila's hands when he attempted to call his girlfriend. The seizures of Monge-Davila's cell phone and his person—including Russell grabbing his arm—prior to Monge-Davila's consent demonstrate that the circumstances of the interaction were coercive.

¶33 In addition, as Monge-Davila contends on appeal, the interaction between Monge-Davila and the officers was far from the cooperative and calm interactions between defendants and officers that were looked upon favorably in *Artic* and other cases. Throughout the interaction, Monge-Davila repeatedly expressed to the officers that he did not understand what was going on and that he did not have drugs in his apartment. After Russell asked to search the second time, Monge-Davila said, "Where's the card or something because I don't know what's going on. I'm scared." Russell pulled out his badge, held it toward Monge-Davila, and exclaimed, "Oh, my credentials? Boom! Right there." *Cf. Artic*, 327 Wis. 2d 392, ¶44 (holding that defendant and officer's conversation about "family and stuff" suggested a "congenial tone to the encounter"); *Phillips*, 218 Wis. 2d at 200-01 (holding that the fact that the defendant gave the agents a magazine when officers left was "inconsistent with a conclusion that the encounter between the agents and the defendant was coercive or that the defendant's will was in any way overcome by the agents' tactics"). In short, given the undisputed facts presented, we agree with Monge-Davila that the circuit court "erred when it

failed to meaningfully consider th[e] third factor." The officers made a show of force and engaged in otherwise coercive actions. We therefore conclude that this factor weighs heavily against a determination of voluntariness.

¶34 The fourth *Phillips* factor considers Monge-Davila's response to the requests to search. "An initial refusal of a request to search will weigh against a finding of voluntariness." *Artic*, 327 Wis. 2d 392, ¶56. The circuit court found that after Monge-Davila's cell phone was seized, "law enforcement asked if they c[ould] go [into] the apartment. I think the initial answer without question is no." With respect to Russell's second request to search, the court found that Monge-Davila asked for a "card" in response. According to the court, "a reasonable inference" of Monge-Davila's request for a "card" is that "he was looking for an authorization that would allow [the officers] to proceed into the apartment." In addition, the court found that Monge-Davila shut and locked his apartment door upon exiting into the hallway. According to the court, these actions "indicate[] some degree of expectation of privacy in attempting to preserve the privacy of his residence."

¶35 The State appears to challenge the circuit court's finding with respect to Monge-Davila's response to the first request to search his apartment. In particular, the State suggests that while Monge-Davila's response to the first request to search was not a "yes," it "was hardly an adamant, 'no.'" The State cites Russell's testimony from the suppression hearing, in which he maintained that Monge-Davila was saying "no" to whether he had drugs in his apartment, not to Russell's first request to search.

¶36 We conclude that the circuit court's finding that Monge-Davila denied Russell's first request to search is supported by the record. Based on the

recording, Russell asked, "What if we wanted to take a look around? If you got a little bit of weed, we wouldn't give a shit about that." In response to Russell's question about taking "a look around," Monge-Davila shook his head side to side and said, "No, like, really, really, no."

¶37 Likewise, the circuit court's findings surrounding Monge-Davila's response to Russell's second request to search are supported by the record. Monge-Davila characterizes these findings as the court articulating that he "explicitly declined to give consent to search." The State does not contend that Monge-Davila mischaracterizes the court's findings, and we deem as conceded any argument to the contrary. *See United Coop.*, 304 Wis. 2d 750, ¶39.

¶38 Therefore, Monge-Davila did not consent to the officers' entry into his apartment until the third request. The fact that officers had to ask three times for permission to enter militates against the consent being voluntary. In addition, we agree with the circuit court that Monge-Davila's action of closing and locking his door was an attempt to "preserve the privacy of his residence," and we consider this factor in our analysis. *See Artic*, 327 Wis. 2d 392, ¶33. Therefore, we conclude that the fourth *Phillips* factor weighs against Monge-Davila's consent being voluntary.

¶39 The sixth *Phillips* factor considers "whether the officers informed the defendant that he could refuse to consent." *Artic*, 327 Wis. 2d 392, ¶60. On this factor, the circuit court found that the officers did not inform Monge-Davila that he could refuse to consent to a search and that the court was "to consider that factor." While it is not "fatal" to a determination of voluntariness when the State cannot demonstrate that "the defendant knew … he [or she] could refuse consent,"

"this factor weighs against voluntariness" when the State cannot demonstrate this fact. *Id.* (citation omitted).

¶40 The State concedes that the officers "did not advise Monge-Davila that he could refuse to consent to the search of his home." However, the State contends that Monge-Davila "could have told police once and for all that he did not want them to enter his home." The State further notes that Monge-Davila was not "oblivious to his options" because Russell's "comments made it abundantly clear that their investigation route turned on whether Monge-Davila agreed to allow officers to search his home or made them 'go the extra mile.'" The State also argues that the fact "that investigators asked for consent several times without simply forcing entry to his home further suggest[s] that investigators were willing to honor his wish not to search his home unless he so authorized."

¶41 We reject the State's arguments for two reasons. First, the *Artic* court held that even where there exists "a reasonable inference" that an individual knew that he or she "could withhold consent," the sixth *Phillips* factor still weighs against a finding of voluntariness, albeit not heavily. *See Artic*, 327 Wis. 2d 392, ¶61; *see also Phillips*, 218 Wis. 2d at 203 (stating that the court would give this factor "little weight" because although the officers did not inform the defendant that he could withhold consent, the defendant "knew that he could refuse to give consent to search"). The court here never found that Monge-Davila knew that he could refuse to give the officers his consent, and Monge-Davila repeatedly expressed to the officers that he did not understand what was happening.

¶42 Second, we agree with Monge-Davila that the officers' repeated requests to enter his apartment, and Monge-Davila's subsequent denials, "actually cut[] against the State" and do not demonstrate that the interaction would depend

on his answers to law enforcement or that the officers would accept his refusal to allow them to enter his apartment. After twice being denied consent to search, the officers continued to detain and question Monge-Davila. Monge-Davila's unwillingness to cede to the officers' first two requests to search—and the officers' refusal to allow Monge-Davila to leave—strongly suggest that the officers' questioning and detention of Monge-Davila were not going to end until he provided consent. Monge-Davila told the officers that they could not enter, yet they continued to try to gain his consent under coercive circumstances. Therefore, like the circuit court, we conclude that the sixth *Phillips* factor weighs in favor of involuntariness because the officers never informed Monge-Davila that he could refuse consent, the record does not support a reasonable inference that he knew he could refuse consent, and the circumstances would demonstrate to a reasonable person that the officers were not going to stop requesting entry to Monge-Davila's apartment until he consented.

¶43    In light of this conclusion, we now summarize the significant facts outlined above in relation to the *Phillips* factors and the circuit court's findings of fact concerning the voluntariness of Monge-Davila's consent. Again, we are to consider these facts under the totality of the circumstances.

¶44    Upon exiting his apartment, Monge-Davila was immediately confronted by several armed officers in a small hallway; officers immediately began questioning him and attempting to look into his apartment; he shut and locked his apartment door; he was cornered by two officers at all times during the interaction; despite his attempt, he was not permitted to leave the hallway and was advised that he was being detained; his cell phone was seized when he attempted to call his girlfriend; he was frisked; and he repeatedly expressed to the officers that he was confused. He was also only 19 years old at the time of the interaction,

and he had not had any significant prior contact with law enforcement. Although the officers did not use deception, trickery, or misrepresentation in their dialogue to persuade Monge-Davila to consent, they did attempt to coerce entry to Monge-Davila's apartment by stating they would not be concerned if they located a small amount of marijuana during their search, but they would not be so forgiving if they had to "go the extra mile."

¶45 The officers never informed Monge-Davila that he could refuse their entry, which is particularly significant to this court when considered in relation to Monge-Davila's unsuccessful attempt to leave and Russell grabbing his arm. Monge-Davila also twice rejected the officers' attempts to search his apartment. Yet, the officers continued with aggressive persistence. These circumstances would demonstrate to any reasonable person that the interaction would not end until Monge-Davila provided his consent.

¶46 Under these circumstances, the State has failed to demonstrate, by clear and convincing evidence, that Monge-Davila's consent was voluntarily provided. In addition, the record does not support the circuit court's finding that Monge-Davila's consent was a calculated decision based on Russell's assertions that the officers could exercise their "discretion" if they found "a little bit of marijuana." As Monge-Davila argues, there is nothing in the record to suggest that he made a calculated decision, as opposed to acquiescing to continued pressure from law enforcement, when he ultimately stated that the officers could enter his apartment. Given the facts presented, we conclude that Monge-Davila's consent was mere acquiescence to the officers' multiple requests to search after constant questioning and his inability to terminate the interaction. *See **Reed***, 384 Wis. 2d 469, ¶8.

¶47 The State concedes that if we reverse the judgment of conviction on the basis that Monge-Davila's motion to suppress should have been granted, the appropriate remedy is plea withdrawal, "given that it appears all of the evidence supporting [the] conviction was located during the search." *See* ***State v. Semrau***, 2000 WI App 54, ¶22, 233 Wis. 2d 508, 608 N.W.2d 376. Accordingly, we reverse the judgment of conviction and remand with directions that the circuit court grant Monge-Davila's motion to suppress and allow him to withdraw his plea.

*By the Court.*—Judgment reversed and cause remanded with directions.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.